# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

DON BLANKENSHIP,

                         Plaintiffs,

        vs.

FOX NEWS NETWORK, LLC, et al.

Case No.: 2:19-cv-00236

[Magistrate Judge Omar J. Aboulhosn]

---

### PLAINTIFF DON BLANKENSHIP'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS TO DEFENDANT NATIONAL REPUBLICAN SENATORIAL COMMITTEE

---

**PLAINTIFF DON BLANKENSHIP'S**
**MOTION TO COMPEL PRODUCTION OF DOCUMENTS TO DEFENDANT**
**NATIONAL REPUBLICAN SENATORIAL COMMITTEE**

Plaintiff Don Blankenship ("Plaintiff" or "Mr. Blankenship"), by and through his undersigned counsel, pursuant to Rules 26, 34, and 37 of the Federal Rules of Civil Procedure, move this Honorable Court for an order compelling Defendant National Republican Senatorial Committee ("Defendant" or "NRSC") the production of documents in response to Plaintiff's First Set of Requests for Production of Documents ("RFPs"). In support of this Motion to Compel, Plaintiff states as follows:

## INTRODUCTION

1.      This is a case of weaponized defamation, which the NRSC and the other conspiracy defendants, including but not limited to, the NRSC's Executive Director Kevin McLaughlin, Defendant 35th Inc. (a single candidate political action committee ("PAC") supporting Attorney General Patrick Morrissey), as well as several political commentators at defendant Fox News Network, LLC ("Fox News"), waged against Mr. Blankenship as he campaigned for the 2018 Republican nomination for the United States Senate.

2.      As alleged in the First Amended Complaint ("FAC"), the NRSC conspired with other specified co-defendants to make false and defamatory statements about Mr. Blankenship in a successful attempt to sabotage an election where a seat in the United States Senate was at stake. The NRSC claims to be "the only national organization solely devoted to strengthening the Republican Senate Majority and electing Republicans to the United States Senate." This lawsuit will determine whether those efforts may include conspiring to intentionally defame candidates for the United States Senate when urged to do so by United States Senators, including Senate Majority Leader Mitch McConnell.

3.      As reported by the media, United States Senate Republications asked the "committee," presumably referring to the NRSC, to create a "menu of items" to destroy Mr. Blankenship and to interfere in a federal election. (ECF No. 14; First Amended Complaint

("FAC"), ¶ 4.)  This request for a menu of options to stop Mr. Blankenship occurred after clandestine meetings of the NRSC and Mr. Blankenship's primary opponent campaign managers in the weeks preceding the May 8, 2018 primary.  At these covert NRSC meetings, Mr. Blankenship's primary opponent campaign managers expressed concern that he had pulled even with his two main contenders and had the momentum needed to win if something was not done to stop him.

4.     After this "menu of options" was completed, a storm of defamatory commentary was unleashed by multiple media outlets, often with well-known Republican operatives as program guests.  This included Mr. McLaughlin, who appeared on CNN and made false statements about Mr. Blankenship, including the following: "Well, I mean, pick your poison with this guy, right?  He doesn't live in West Virginia, he's a ***convicted felon***." (FAC, ¶ 18 (emphasis in original).)  Other political operatives took to the air, including Judge Andrew Napolitano (Ret.) and Stephanie Hamill of Fox News.  (FAC, ¶¶ 157, 167.)  As alleged in a related action (USDC SDWV Case No. 2:19-cv-00549), Donald Trump Jr. tweeted that Mr. Blankenship was a "felon" after meeting with NRSC leaders seeking to prevent Plaintiff's victory in the Primary.[1]

---

[1]     In addition, beginning in 2014, the FAC alleges that the federal government brought a politically motivated indictment against Mr. Blankenship alleging multiple felonies and one misdemeanor arising out of his position as the Chief Executive Office of Massey Energy Company.  The jury acquitted Mr. Blankenship of all felonies and, instead, solely convicted him of conspiracy to violate mine safety laws (a misdemeanor).  Recently, United States Magistrate Judge Omar J. Aboulhosn recommended in a 60-page Opinion that Mr. Blankenship's misdemeanor conviction be vacated because the federal prosecutors, including then United States Attorney R. Booth Goodwin II violated *Brady* when they withheld exculpatory evidence and committed admitted "errors" during the discovery phase and trial of Mr. Blankenship's criminal prosecution.

Notwithstanding the foregoing, in the weeks leading up to the 2018 Republican Senate Primary election, the defendants in this lawsuit defamed Mr. Blankenship when they repeatedly called him a "felon" responsible for the deaths of 29 miners.  In fact, none of these alleged crimes arose from the 2010 disaster at the Upper Big Branch mine.  In *United States v. Blankenship*, the district court unequivocally declared that Mr. Blankenship "***was not charged with or convicted of causing the explosion at Upper Big Branch or with causing the deaths of any miners at Upper Big Branch***."

5.      Throughout this lawsuit, the NRSC has improperly raised "First Amendment concerns" to delay this proceeding and to shield itself from discovery.  The NRSC's concerns are not only unfounded, they are ironic given the circumstances of this case.

6.      The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 244, 270 (1964).  Mr. Blankenship is a major figure in West Virginia politics, industry, and culture.  He is the most outspoken and controversial figure in the state.  So outspoken that federal prosecutors have said that his speech "troubles the United States" and this Court has referred to as "vitriolic rhetoric."  To protect uninhibited and robust debate on public issues, as required by the United States Constitution, members of the federal government and the media should not be permitted to defame a political candidate in an attempt to chill his speech, regardless of how controversial.

7.      Here, the NRSC curtailed Mr. Blankenship's freedom of speech by maliciously and repeatedly defaming him in order to marginalize and discredit him as a speaker, as well as destroy his chances of winning the Primary.  As alleged in the FAC, the NRSC was extremely concerned that if Mr. Blankenship prevailed in the Primary, he would beat Joe Manchin in the general election (and bring his voice against Mr. McConnell to the Senate); an anathema to the NRSC, as its members themselves had expressed at the time.

8.      Given this context, as well as Mr. Blankenship's history of persecution by the federal government and the media, the factual allegations in the FAC show an agreement by the levers of power, the NRSC, and the other Conspiracy Defendants to wrongfully interfere in an election and to stop Mr. Blankenship's candidacy by any means necessary, including by maliciously smearing him in the media with statements the defendants knew were false.  This misconduct is wholly offensive to the First Amendment.  Accordingly, Mr. Blankenship has filed this lawsuit to protect his constitutional rights.

## RELEVANT BACKGROUND

9.      On March 14, 2019, Plaintiff filed his complaint against Defendants in the Circuit Court of Mingo County, West Virginia.  (ECF No. 1.)  The action was removed to this Court.

10.     The Complaint alleges that the NRSC and other Conspiracy Defendants engaged in a concerted scheme to prevent Mr. Blankenship from winning the West Virginia Primary Election by launching a campaign of defamation against him.  For example and without limitation, the Complaint alleges in relevant part:

> [T]he Conspiracy Defendants shared the common plan of ensuring that Plaintiff did not win the West Virginia Primary Election.  To that end, the Conspiracy Defendants agreed that McLaughlin and the Conspiracy Does would themselves disseminate, and cause and/or encourage others to disseminate the false claim that Plaintiff was a "felon" or "convicted felon." The Conspiracy Defendants, and each of them, knew that this claim was untrue, as Plaintiff had been convicted only of a misdemeanor and had been acquitted of all felony charges. (ECF No. 14, ¶¶ 233, 234.)

11.     The normal practice for an entity in response a complaint of this magnitude would be to at least identify, and certainly preserve, potentially relevant documents.

12.     Indeed, the law generally imposes on litigants a duty to preserve discoverable material once the party knows, or should know, that the material is likely to be requested in discovery.  *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 299 F.R.D. 502, 511 (S.D.W. Va. 2014) ("The duty to preserve evidence arises 'not only during litigation but extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.'") (citing *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001)). ***"Once the duty is triggered, the party should 'identify, locate, and maintain information that is relevant to specific, predictable, and identifiable litigation' and 'notify the opposing party of evidence in the hands of third parties*.'" *Id*. (emphasis added) (citing *Victor*

*Stanley, Inc. v. Creative Pipe, Inc.,* 269 F.R.D. 497, 522–23 (D.Md. 2010)).  The failure of a party in a federal proceeding to preserve material evidence may result in the imposition of sanctions under Federal Rule of Civil Procedure 37, or through the court's inherent authority "to control the judicial process and litigation."  *Id.*

13.     Consistent with the foregoing, on or about April 16, 2019, Plaintiff dispatched "document retention" letters to Defendant and its current Executive Director, Kevin McLaughlin. As is customary, this letter reminded these parties of their obligation to preserve any documents relating to this matter.

14.     Over twelve months after sending the Document Retention Letters, on May 1, 2020, Plaintiff served the subject RFPs on Defendant.  (ECF No. 443.)

15.     On June 22, 2020, Plaintiff received responses and objections to the RFPs from Defendant, a true and correct copy of which is attached as Exhibit A.  Not a single document, of any kind, was produced.

16.     By letter dated June 22, 2020, Plaintiff sent Defendant a detailed letter setting forth the numerous deficiencies with its responses, seeking answers in compliance with the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure, as well as supplementation.  The letter constituted Plaintiff's good faith attempt to resolve the discovery disputes without the Court's intervention.   A true and correct copy of Plaintiff's meet and confer letter is attached hereto as Exhibit B.

17.     In addition, Plaintiff scheduled a follow-up call with counsel for Defendant in an attempt to further meet and confer and to resolve any areas of disagreement.  In response to the telephonic conference call between counsel on June 26, 2020, the NRSC agreed to produce certain non-confidential and non-privileged responsive documents, which were produced on or about July 7, 2020.  (ECF No. 490.)  By letter dated July 2, 2020, the NRSC stated that it is withholding responsive documents on the basis of an unspecified "objection" and/or "claim of privilege" with respect to RFP Nos. 1-13, 18, 19, 21, 25, 27, 31-33, 37, 40, 45, 46, 49, and 53.  A true and correct copy of Defendant's letter dated July 2, 2020 is attached hereto as Exhibit C.

18.     Despite these efforts, no agreement was reached regarding the discovery issues set forth below prior to the deadline to file a motion to compel.  Accordingly, this Motion to Compel is now necessary and appropriate.

## <u>LEGAL STANDARD</u>

19.     "The rules of discovery are to be given broad and liberal construction."  *White v. Sam's E., Inc.*, 2016 WL 205494, at *1 (S.D.W. Va. Jan. 15, 2016) (citing *Herbert v. Lando,* 441 U.S. 153, 177 (1979); *Clere v. GC Servs., L.P.*, 2011 WL 2181176, at *1 (S.D.W. Va. June 3, 2011) ("It is well-established that the "discovery rules are to be accorded a broad and liberal treatment.").  Rule 26(b)(1) of the Federal Rules of Civil Procedure provides as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  *See* Fed. R. Civ. P. 26(b)(1).

20.     Although Rule 26 does not define what is deemed relevant for purposes of the rule, relevance has been "broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party."  *White*, 2016 WL 205494, at *1.  The district court has broad discretion in determining relevance for discovery purposes.  *Id.* (citing *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 489 (4th Cir. 1992)).  "The party resisting discovery bears the burden of establishing the legitimacy of its objections."  *Id.* (emphasis added) (citing *Brey Corp. v. LQ Mgmt., L.L.C.*,  2012 WL 3127023, at *4 (D. Md. July 26, 2012) ("In order to limit the scope of discovery, the 'party resisting discovery bears the burden of showing why [the discovery requests] should not be granted.'") (quoting *Clere*, 2011 WL 2181176, at *2)).

21.     Rule 37 provides in relevant part that if a party fails to produce documents in response to a discovery request, the discovering party may move for an Order compelling

7.2

production.  *See* Fed. R. Civ. P. 37(a)(3)(B); *Pinnacle Mining Co., LLC v. Bluestone Coal Corp*., 2015 WL 1482305, at *2 (S.D.W. Va. Mar. 31, 2015); *George Golf Design, Inc. v. Greenbrier Hotel, Inc*., 2012 WL 5285410, at *4 (S.D.W. Va. Oct. 23, 2012) (granting motion to compel).

22.    The Rule requires a certification "that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."  Fed. R. Civ. P. 37(a)(1).

23.    This requirement has been satisfied here.  Counsel has engaged in a good faith effort to confer with opposing counsel by letter and by telephone to narrow the areas of disagreement to the greatest possible extent in compliance with Rule 37 and Local Rule 37.1, as evidenced by the attached meet and confer letter, which was followed by a telephone conference call of counsel for the parties.  (*See* Exhibit B.)

24.    Rule 37 further provides that the Court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay to the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless the nondisclosure was substantially justified or an award of expenses would be unjust.  Fed. R. Civ. P. 37(a)(5)(A) (emphasis added).

## ARGUMENT

### I.    In Violation of Rule 34(b)(2)(C), Defendant's Objections Do Not State Whether Defendant Is Withholding Responsive Documents

25.    As a preliminary matter, none of Defendant's responses are compliant with Federal Rule of Civil Procedure 34(b)(2)(C), which requires that objections to RFPs specifically "state whether any responsive materials are being withheld on the basis of that objection."  Due to Defendant's failure to comply with this rule, it is impossible to determine whether Defendant's objection-only responses are causing any responsive documents to be withheld.  For this reason alone, Defendant must supplement its responses.

///

///

## II.    **Defendant's Boilerplate Objections Are Without Merit**

26.    As a preliminary matter, to the extent Defendant objects to the production of any purportedly "confidential documents and a privilege log without entry of a protective order," these objections are now moot.  A Protective Order was entered on July 10, 2020.  (ECF No. 495.) Notwithstanding the foregoing, Defendant has failed to produce any additional responsive "confidential" documents and/or a privilege log, as required.

27.    Defendant improperly asserts a litany of purported "General Objections" to all requests, as well as boilerplate objections in response to each of the individual document requests. *See* RFP Nos. 1-55.  For example and without limitation, Defendant "incorporates the General Objections and Objections to Plaintiff's Definitions and Instructions," and objects to each request as "overly broad and unduly burdensome because it seeks documents that are not relevant to the conspiracy claims made against the NRSC."  Defendant also objects to each request "because it is not 'proportional to the needs of the case'" and "to the extent is seeks documents protected by any applicable privilege, including documents protected from disclosure by the First Amendment."

28.    Defendant's responses to the document requests are a classic example of improperly-asserted boilerplate general objections.  *See Jones v. Bank of Am., N.A.*, 2015 WL 1808916, at *4–5 (S.D.W. Va. Apr. 21, 2015) (rejecting boilerplate general objections and granting motion to compel); *Mainstreet Collection, Inc. v. Kirklands, Inc.,* 270 F.R.D. 238, 240 (E.D.N.C. 2010) (mere recitation of the familiar litany that a request is overly broad, burdensome, oppressive, and irrelevant does not constitute a specific objection); *Hager v. Graham*, 267 F.R.D. 486, 492 (N.D.W. Va. 2010) ("general objections to discovery, without more, do not satisfy the burden of the responding party ... because they cannot be applied with sufficient specificity to enable courts to evaluate their merits."); *Mills v. East Gulf Coast Preparation Co., LLC,* 259 F.R.D. 118, 132 (S.D.W. Va. 2009) ("boilerplate objections regurgitating words and phrases from Rule 26 are completely unacceptable"); *Mancia v. Mayflower Textile Services Co.*, 253 F.R.D. 354, 358–59 (D.Md. 2008) (court disapproves of a general objection asserted "to the extent" that it applies). Furthermore, by continuing to raise improper, non-particularized objections, counsel runs the risk

of waiving any valid objections that may exist. *Id.* at 359; *see also Mezu v. Morgan State University,* 269 F.R.D. 565, 573 (D. Md. 2010).

29.     With respect to Defendant's objections based on purported undue burden, courts in the Fourth Circuit have found similarly general objections to be without merit. *See Jones*, 2015 WL 1808916, at *4–5. For example, the Court in *Jones* emphasized that it is the answering party's obligation to support such objections with proof of the burden. *Id.* at *4. However, like here, the responding party in *Jones* failed to supply any evidentiary foundation for its objections. *Id.* The Court rejected counsel's contention that the "burden and cost" of locating and producing documents responsive to Plaintiffs' requests would clearly outweigh any potential benefits to be realized from their production because counsel failed to produce any evidence to support that conclusion. *Id.* The Court in *Jones* held in relevant part: "In the absence of specific information demonstrating a genuine burden to BANA that can be weighed against the anticipated usefulness of the documents requested, BANA's objections are not justified." *Id.* at *5.

30.     The same reasoning applies here. Defendant has failed to provide specific information showing a genuine burden to Defendant that can be weighed against the anticipated benefit of the requested documents, and therefore, Defendant's objections are unjustified. *See id.*

31.     For the reasons demonstrated above, Defendant's objections are without merit. Subject to these improper objections, Defendant has indicated that it will produce documents in response to RFP Nos. 1–28, 37–50 and 52–55. However, no documents have been produced to date, necessitating this Motion to Compel.

## III.     Defendant's Blanket Assertion Of "Any Applicable Privilege" Is Improper

32.     Defendant improperly objects to each document request "to the extent it seeks documents protected by any applicable privilege…." As previously discussed, such generalized objections are improper. *See e.g.*, *Mancia v. Mayflower Textile Services Co.*, 253 F.R.D. 354, 358–59 (D.Md. 2008) (court disapproves of a general objection asserted "to the extent" that it applies).

///

9

### A.     Defendant's Reliance on the Attorney-Client Privilege is Misplaced

33.     Federal Rule of Evidence 501 governs the attorney-client privilege in federal court, which provides in relevant part, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  In the instant case, the substantive claims and defenses are matters of state law.  Thus, whether a particular document is privileged as an attorney-client communication or subject to work product protection will be determined under West Virginia law.  Critically, "the burden of establishing the attorney-client privilege ... always rests upon the person asserting it."  *Jones*, 2015 WL 1808916, at *3 (citing *State ex rel. U.S. Fid. and Guar. Co. v. Canady,* 460 S.E.2d 677, 684 (W.Va. 1995)). Defendant has failed to meet this burden and establish that any of the requested information is protected by the attorney-client privilege and/or work product doctrine.

34.     Further, when a party withholds information from discovery on the basis of the attorney-client privilege or work product doctrine, the party is *required* to produce contemporaneously with its discovery response a privilege log that satisfies the requirements of Federal Rule of Civil Procedure 26(b)(5).  Courts have held that the failure to supply a privilege log as required by Rule 26(b)(5) may result in waiver of the objection.  *See Jones*, 2015 WL 1808916, at *5 (citing cases).

35.     Although Defendant repeatedly asserts the attorney-client privilege and work product objection throughout its answers to Plaintiff's document requests, it has failed to produce a privilege log.  Thus, Defendant has waived these objections.  *See id*.  Accordingly, Defendant should be ordered to provide the requested documents and/or a privilege log.

### B.     Defendant's Objections Based on the First Amendment are Unsupported

36.     Defendant improperly objects to the document requests to the extent they seek documents "protected from disclosure by the First Amendment."  These objections are also inappropriate.

37.     Although there is a qualified privilege against the discovery of information where compelled disclosure would likely chill associational rights, it is not absolute.  *Pulte Home Corp.*

*v. Montgomery Cty. Maryland*, 2017 WL 1104670, at \*3 (D. Md. Mar. 24, 2017) (citing cases). In applying this framework, "courts must carefully scrutinize the need for First Amendment protection." *Id.* "***The first part of the framework requires the party asserting the privilege to make a prima facie showing that the privilege applies***." *Id.* at \*4 (emphasis added). To make this showing, the party must "demonstrate an objectively reasonable probability that compelled disclosure will chill associational rights, *i.e.*, that disclosure will deter membership due to fears of threats, harassment, or reprisal ... which may affect members' physical well-being, political activities or economic interests." *Id.* "If the party asserting the privilege is unable to make a prima facie showing, there is no First Amendment privilege protecting against disclosure." The NRSC has made absolutely no attempt to make this required prima facie showing and its First Amendment objections are without merit for this reason alone.

38.    The irony of the NRSC's reliance on the First Amendment to shield it from any discovery should not go unaddressed. Indeed, there can be no more clear attack on the First Amendment than in this case where the United States Senate Majority Leader directs a political action committee (the NRSC) that he controls to engage in unprotected defamatory speech to stop a public figure from winning a United States Senate race.

39.    Here, the public figure is not only criticizing the government, but is also publicly calling for removal of that Senate Majority Leader. If a Senate Majority Leader can direct a smear campaign while also controlling hundreds of millions of dollars with which he can defame or cause to be defamed his critics, this begs the question—how is an American citizen ever to impact government policies? The First Amendment operates as bulwark against *government* actions to stifle free expression. In the instant case, however, the NRSC's misconduct operated to stifle Mr. Blankenship's free expression, in violation of that Constitutional protection.

40.    Nonetheless, the NRSC's defamatory comments had the devastating effect of destroying Mr. Blankenship's credibility, as well as his ability to gain the trust of the public and to influence public opinion. Accordingly, Mr. Blankenship's right to speak freely is at the core of

11

his claims in this action and his allegations that the NRSC unlawfully interfered in his campaign and election.

41.    As alleged in the FAC, Mr. Blankenship was viewed by the NRSC and Leader McConnell as a non-establishment candidate who expressed views to which they objected. Because Mr. Blankenship was targeted due to his non-establishment views by individuals at the highest levels of the United States government, his claims fall within the heart of the First Amendment.

42.    As alleged in the FAC, the NRSC effectively placed a "gag order" on Mr. Blankenship when he ran for United States Senate.  That "gag order" came from the NRSC's orchestration of a weaponized defamation campaign against Mr. Blankenship, in order to undermine his Senate race and silence his public voice—which would have become materially louder and more influential if, as many expected (and the NRSC expressly feared)—Mr. Blankenship had been elected.  The weaponized defamation began after Mr. Blankenship criticized and vowed that he would vote against the current Senate Majority Leader if elected.  Mr. Blankenship was then verbally disparaged by Republican Senators as unfit to represent the Republican Party and also was defamed by a single-candidate super PAC supporting Patrick Morrisey (Defendant 35th PAC).

43.    Ironically, the NRSC primarily relies on the Ninth Circuit's decision in *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) to assert the First Amendment as a shield from the requested discovery.  (Exhibit A, pp. 3-4.)  Notably, Republicans, like the NRSC, have publicly mocked the Ninth Circuit as intolerably liberal.[2]  In any event, *Perry* is entirely distinguishable.

---

[2] Indeed, *The Washington Post* has recently reported:

> President Trump and conservative commentators routinely mock the U.S. Court of Appeals for the 9th Circuit as intolerably liberal: It's the "Ninth Circus" to Rush Limbaugh, the "Nutty Ninth" to former NRATV commentator Dan Bongino, "a complete & total disaster," according to the president. For the political right, it's an institution loathed for once finding that the words "under God" meant mandatory public-school recitation of the Pledge of Allegiance runs afoul of the First Amendment; for once engaging in an all-night battle with the Supreme Court over the constitutionality of an execution; and for thrice enjoining the Trump

44.     *Perry* involved the efforts of a party in the same-sex marriage lawsuit in California to obtain internal campaign communications relating to the campaign strategy and advertising of the proponents of a ballot proposition.  Focusing on First Amendment associational rights, the Ninth Circuit held that the district court erred in determining that "the First Amendment privilege, as a categorical matter, does not apply to the disclosure of internal campaign communications." *Id.* at 1161.  The Ninth Circuit concluded that permitting discovery "would likely have a chilling effect on political association," and that plaintiffs had "not shown a sufficient need for the information." *Id.* at 1165.  Critically, however, the Ninth Circuit emphasized that its holding was specifically "limited to *private internal* campaign communications concerning the *formulation of campaign strategies and messages*." *Id.* at 1165, n. 12 (emphasis in original).

45.     To the extent the holding in *Perry* applies here (which is disputed, as the Fourth Circuit only recognizes a qualified privilege), the Court's analysis is instructive.  The opponents of disclosure must make a *prima facie* case of arguable First Amendment infringement and only then does the burden shift to plaintiff to "demonstrate a sufficient need for the discovery to counterbalance that infringement." *Id.* at 1164.

46.     In this regard, *Perry* emphasized that where, like here, the "campaign information" is essential to establishing a plaintiff's case, the balance weighs in favor of disclosure. *Id.* at 1161.

47.     In the instant case, the NRSC has not satisfied its initial burden—i.e., it has not demonstrated any consequences which objectively suggest an impact on, or chilling of, associational rights. *Id.* at 1163.

48.     Thus, the instant case is distinguishable from *Perry*.  In *Perry*, the Ninth Circuit reasoned that Proponents have made "a *prima facie* showing of arguable first amendment

_____

administration's infamous travel ban. The 9th Circuit is so notorious among congressional Republicans that as recently as the last Congress, they held hearings to consider splitting up the circuit geographically, on the premise its rulings, which once applied to a reported 4 percent of the country, now cover 20 percent of Americans — too much liberal influence, perhaps.

*See* https://www.washingtonpost.com/outlook/2019/02/28/thanks-trump-liberal-ninth-circuit-is-no-longer-liberal/.

infringement by demonstrating consequences which objectively suggest an impact on, or 'chilling' of, ... associational rights." *Id*. at 1163 (internal quotations omitted). They presented declarations from several individuals attesting to the impact compelled disclosure would have on participation and formulation of strategy. For example, a member of ProtectMarriage.com's ad hoc executive committee, stated:

> I can unequivocally state that if the personal, non-public communications I have had regarding this ballot initiative— communications that expressed my personal political and moral views—are ordered to be disclosed through discovery in this matter, it will drastically alter how I communicate in the future.... *Id*.

49.    The NRSC has presented no such evidence here. The NRSC cannot credibly claim that any personal and/or private views are at issue here. Instead, the NRSC openly claims to be "the only national organization solely devoted to strengthening the Republican Senate Majority and electing Republicans to the United States Senate." In this regard, the NRSC publicly "advocates Republican principles and supports Republican candidates at the federal, state and local levels." *See McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 332 (D.D.C. 2003). The NRSC has also publicly admitted that its members include all incumbent Republican Members of the United States Senate.[3]

50.    Thus, unlike in *Perry*, the NRSC has failed to demonstrate any adverse impact compelled disclosure would have on participation in the NRSC (which is public information), and/or formulation of strategy.

51.    Moreover, the holding in *Perry* is strictly limited to "private internal campaign communications concerning the formulation of campaign strategies and messages," and would not apply to communications between the NRSC and the Republican Party and other political groups, and/or communications with candidates, advisors, vendors, political supporters, and other individuals

---

[3]  https://www.supremecourt.gov/DocketPDF/19/19-122/113593/20190826124437933_19-122ac NationalRepublicanSenatorialCommitteeAndNationalRepublicanCongressionalCommittee.pdf.

7.2

regarding other matters, as requested by the RFPs. Moreover, as demonstrated below, the requested information is highly relevant to Plaintiff's claims here, which further weighs in favor of compelled disclosure.

52.     For the above reasons, the NRSC's objections based on the First Amendment are without any basis and the NRSC should be ordered to produce the requested documents.

**IV.    The Requests (RFP Nos. 29-36, 51) Seek Information Directly Relevant To Plaintiff's Claims, Including The Conspiracy to Defeat Mr. Blankenship**

53.     Notwithstanding the above, Defendant has refused to produce documents in response to the following requests, apparently on relevance grounds. *See* RFP Nos. 29-36, and 51. As demonstrated below, Defendant's objections to these requests are wholly improper as they appropriately seek nonprivileged information that is highly relevant to Plaintiff's claims. *See Pinnacle Mining Co., LLC v. Bluestone Coal Corp.*, 2015 WL 1482305, at *2 (S.D.W. Va. Mar. 31, 2015) (discovery may include nonprivileged information which is relevant to any party's claim or defense).

54.     With respect to document requests relating to communications that refer or relate to a meeting in South Florida on May 3, 2018 attended by Donald Trump, Jr. and individuals affiliated with the Republican National Convention and/or the NRSC, as well as any documents and communications by and between the National Republican Congressional Committee and the NRSC which concern any transfer of funds prior to the 2018 West Virginia Primary, Defendant's objections are without merit. *See* RFP Nos. 29-36, and 51. These documents relate directly to the flow of information and resources in service of the conspiracy, which included the NRSC, persons in attendance at the meetings, and persons and entities who received material support from the NRSC to further the conspiracy.

55.     The requested communications are directly relevant to Plaintiff's claims, which allege that Defendants and various third parties commenced a "search and destroy mission" and otherwise conspired to stop Mr. Blankenship from winning the West Virginia Primary Election by launching a campaign of defamation against him. (FAC, ¶ 2.) Specifically, Plaintiff alleges that

various Conspiracy Defendants, including the NRSC, "shared the common plan of ensuring that Plaintiff did not win the West Virginia Primary Election," and "agreed that they would themselves disseminate, and cause and/or encourage others to disseminate the false claim that Plaintiff was a 'felon' or 'convicted felon.'"  (FAC, ¶ 234.)  Thus, the requested information is highly relevant to Plaintiff's claims, and to who participated in this common plan.

56.     In addition to improperly asserting various boilerplate objections, Defendant claims that these requests purportedly seek documents irrelevant to the parties' claims and defenses, and are without any reasonable scope limitation.  The communications sought all relate to specific events or statements during the 2018 election cycle, and, thus, are reasonably limited in time. Defendant's objections are meritless and Defendant should be ordered to produce all responsive documents.

**V.     The NRSC's Limited Document Production Is Insufficient and Defective**

57.     Notwithstanding the above, the NRSC produced a limited number of responsive documents on or about July 7, 2020.  However, this document production is insufficient, as the documents were not produced in their original native format, as requested.  In this regard, the RFPs specifically provide that:  "Responding party is requested to produce any electronically stored information ("ESI") in its native format."  Instead, the NRSC improperly produced image files (in this instance, JPG files), which substantially limit the information being produced.  The details that accompany original native files, known as "metadata," are entirely missing from image files. Here, for example, the NRSC produced several sets of images depicting documents from Plaintiff's criminal case relating to his conviction and, by extension, his status as a misdemeanant.  Because these were produced as images without metadata, which fail to comply with Plaintiff's instructions, it is impossible to tell when the NRSC obtained these documents.  This information is directly relevant to Plaintiff's claims.  For example and without limitation, if the NRSC obtained these documents immediately after meeting with party leadership in the period leading up to the Primary when the defamatory falsehoods "ramped up," that would bolster Plaintiff's contention that the

NRSC conspired to defame him in order to torpedo his candidacy. (*See* FAC, ¶¶ 14, 150, 233-237.)

## VI.    **An Award Of Expenses, Including Attorney's Fees, Is Appropriate And Necessary**

58.    Pursuant to Rule 37, if this Motion to Compel is granted, the court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay to the movant's reasonable expenses incurred in making the motion, including attorney's fees," unless the nondisclosure was substantially justified or an award of expenses would be unjust. Fed. R. Civ. P. 37(a)(5)(A) (emphasis added).

59.    In the instant case, Defendant's misconduct in failing and refusing to produce the requested documents necessitated this Motion to Compel.   Such conduct was not substantially justified and an award of expenses in favor of Plaintiff and against Defendant would not be unjust. See id.  Pursuant to Rule 37(a)(5)(A), Plaintiff seeks any and all expenses, including attorneys' fees, that he has incurred (and will incur) in seeking an Order compelling the requested discovery.

60.    To date, Plaintiff has incurred at least $2,250 in expenses in connection with this Motion to Compel.

///

///

///

///

///

///

///

///

///

///

///

## **CONCLUSION**

61.    For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion to Compel in its entirety and enter an Order:  (1) compelling Defendant to produce the documents as requested by the subject RFPs; and (2) award any and all expenses, including attorneys' fees, that Plaintiff has incurred (and will incur) in bringing this Motion to Compel.

Date:   July 20, 2020                                    Respectfully submitted,

**DON BLANKENSHIP**

**By Counsel**

_____*/s/ Jeremy Gray*
**Eric P. Early, Esq.**
**(CA State Bar No. 166275,** *pro hac vice*)
**Jeremy Gray, Esq.**
**(CA State Bar No. 150075,** *pro hac vice*)
**Kevin S. Sinclair, Esq.**
**(CA State Bar No. 254069,** *pro hac vice*)
*EARLY SULLIVAN WRIGHT*
*GIZER & McRAE LLP*
**6420 Wilshire Blvd., 17th Floor**
**Los Angeles, CA 90048**
**323.301.4660**
**eearly@earlysullivan.com**
**jgray@earlysullivan.com**
**ksinclair@earlysullivan.com**

_ */s/ Jeffrey S. Simpkins*
**Jeffrey S. Simpkins, Esq.**
**WVSB #9806**
*SIMPKINS LAW*
**102 E. 2nd Ave.**
**Williamson, WV 25661**
**304.235.2735**
**simpkinslawoffice@gmail.com**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of July 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the Electronic Service List for this Case.

_/s/ Jeremy Gray_

Jeremy Gray, Esq.