**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

DON BLANKENSHIP,

     *Plaintiff*,

                                 Case No. 2:19-cv-00236

v.                                  Hon. Omar J. Aboulhosn

FOX NEWS NETWORK, LLC, *et al.*,

     *Defendants*.

**NATIONAL REPUBLICAN SENATORIAL COMMITTEE'S OPPOSITION TO
PLAINTIFF'S MOTION TO COMPEL**

The Supreme Court has emphasized that the First Amendment "has its fullest and most urgent application . . . to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). And "debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms." *Republican Party of Minnesota v. White*, 536 U.S. 765, 781 (2002). Plaintiff Don Blankenship moves to compel the NRSC to produce documents that are at the very heart of First Amendment protection: communications and documents directly related to the formulation of the NRSC's campaign strategy and messaging. This Court should deny the motion.

Compelled disclosure of a political organization's internal communications has an obvious "chilling effect" on First Amendment rights because it dampens the candor of internal communications, deters participation in campaign activities, and reveals campaign strategy and tactics to political opponents. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010). All of these interests are implicated in this case. The emails and other documents the NRSC has withheld include private opinions and assessments of numerous Senate candidates and

1

campaigns as well as sensitive proprietary information relevant to how the NRSC makes decisions and commits resources over multiple election cycles. As the declarations submitted by the NRSC's Political Director, Polling Director, and Research Director attest, disclosing these documents would undoubtedly chill the NRSC's associational rights—particularly if they are disclosed to one of the NRSC's political opponents who may run again in the near future.

As a threshold matter, the First Amendment privilege applies if there is "*some probability*" that compelled disclosure would have a chilling effect on the exercise of First Amendment rights. *Pulte Home Corp. v. Montgomery Cnty. Maryland*, No. GJH-14-3955, 2017 WL 1104670, at *4 (D. Md. Mar. 24, 2017) (emphasis added) (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981)). The privilege can be overcome only if the documents at issue are "essential" to the plaintiff's claims. Doc. 521 ("Supp. Br.") at 10. This imposes a "heightened relevance standard," *Perry*, 591 F.3d at 1164, which requires a showing that the documents are of "central or crucial importance to the case," *Pulte*, 2017 WL 1104670, at *8.

Blankenship cannot make that showing here because the documents he seeks are completely unrelated to his claims. Blankenship does not allege that the NRSC itself said anything defamatory about him, but instead speculates that the NRSC "conspired" to have *others* defame him. He identifies only two alleged co-conspirators—Kevin McLaughlin and 35th PAC—but the documents he seeks have nothing to do with either of these parties. Not a single document contains anything about any communication or agreement with either McLaughlin or 35th PAC. Nor do the documents say anything about any supposed plan to defame Blankenship, which is the sole fanciful allegation that his entire wild-eyed conspiracy claim is built around.

Blankenship's only argument for the necessity of the documents is that the NRSC's privilege log supposedly shows that the NRSC was "deeply involved in opposing his candidacy." Supp. Br. 11. But, of course, political opposition is not suggestive of illegality, nor does it provide any basis to defeat the privilege. To the contrary, the entire point of the First Amendment privilege is to *protect* confidential political communications unless they have some crucial bearing on the plaintiff's claims. Here, however, Blankenship does not even attempt to articulate how the documents he seeks are relevant to his claim. Even if the NRSC was opposed to his candidacy, that has no bearing whether it entered an unlawful "conspiracy" to defame him. Much less can Blankenship satisfy the "heightened relevance" standard by showing that the documents he seeks have some "central or crucial importance to the case." *Pulte*, 2017 WL 1104670, at *8.

Blankenship's broad discovery requests reveal his true purpose. Despite making 55 requests for documents, many of which are completely irrelevant—including multiple requests for documents regarding Donald Trump Jr.'s Twitter and communications with "West Virginia based businessperson(s) and/or coal operators"—Blankenship did not see fit to specifically ask for communications with one of the two alleged co-conspirators (McLaughlin). This shows that Blankenship is not actually interested in attempting to prove his contrived conspiracy claim, which he knows is a complete fabrication. Rather, he seeks only to punish his political enemies and expose their confidential political communications through his intrusive discovery requests. This Court should not allow him to do so.

## **BACKGROUND**

In 2018, Blankenship was a candidate for the Republican nomination for U.S. Senate in West Virginia. On May 8, 2018, he lost the primary election, placing third behind the victor,

Patrick Morrisey, and runner-up Evan Jenkins. The campaign was heated. One of the issues was Blankenship's criminal record, as he had served a year in prison for conspiring to willfully violate mine-safety standards. Based on that conviction and sentence, multiple different commentators all across the political spectrum referred to Blankenship as a "felon" during the campaign. Blankenship sued for defamation, claiming that he was not technically a "felon" under federal law because his maximum sentence of a year in prison was technically one day shy of qualifying as a "felony" under the federal criminal code.

The NRSC, a national party committee dedicated to electing Republicans to the U.S. Senate, is one of the defendants in this case. Notably, however, the NRSC is the only defendant not alleged to have said anything defamatory about Blankenship. Instead, Blankenship alleges that the NRSC conspired with others—specifically, 35th PAC and Kevin McLaughlin—to have *them* defame him. Am. Compl. ¶ 233. Based on this outlandish conspiracy theory, Blankenship served a request for production of documents on the NRSC on May 1, 2020. Pursuant to an agreement between the parties, the NRSC served responses and objections on Blankenship on June 22. *See* Doc. 503-1. In particular, the NRSC objected to producing internal campaign communications and other confidential materials subject to the First Amendment privilege. *See id.* at 3–4. After entry of a protective order, the NRSC produced responsive documents and a privilege log describing all the documents protected by the privilege.

On July 20, Blankenship filed the instant motion to compel. Doc. 503. This Court stayed the response deadline pending discussions between the parties. Doc. 511. After the parties could not reach agreement, Blankenship filed a supplemental brief on the First Amendment privilege

issue on August 4. Doc. 521. On August 10, this Court set a deadline of August 24 for the NRSC to respond to the motion to compel. Doc. 530.[1]

## ARGUMENT

The First Amendment privilege shields the NRSC's documents in this case. The privilege applies because forcing the NRSC to disclose its sensitive internal political communications to one of its most dogged political opponents would have a significant chilling effect on its exercise of First Amendment rights. *Pulte*, 2017 WL 1104670, at *8. And Blankenship cannot overcome the privilege because he has not shown that any of the documents he seeks have any significant importance to his conspiracy claim, much less "central or crucial importance." *Id.* at *8. Accordingly, the Court should deny Blankenship's motion to compel.

## I.    THE FIRST AMENDMENT PRIVILEGE PROTECTS THE WITHHELD DOCUMENTS FROM DISCLOSURE.

The First Amendment guarantees the right to free association for political purposes. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958). And the right to free association entails the right to confidential discussions of political matters. *See Perry*, 591 F.3d 1147; *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987). Accordingly, there is a qualified privilege against the discovery of such matters when compelled disclosure would likely chill First Amendment rights. *Pulte*, 2017 WL 1104670 at *3. Courts apply a two-part framework for evaluating First Amendment privilege claims in discovery. First, the party asserting the privilege must make a prima facie showing that the

---

[1] During the August 10 telephonic hearing, the parties agreed and the Court determined that the NRSC is required only to respond with respect to the First Amendment privilege issue. The deadline to respond to the other issues raised in the motion remains stayed.

privilege applies. *Id.* at *4. Second, the party seeking disclosure must demonstrate that the information sought is "essential" and of "crucial relevance" to its case. *Id.*; Supp. Br. 10.

### A.    Compelled Disclosure of the Withheld Documents Will Chill the NRSC's Associational Rights.

A party asserting the First Amendment privilege must make a "prima facie showing of arguable [F]irst [A]mendment infringement." *Perry*, 591 F.3d at 1160. A party can make this showing if disclosure will result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Id.* The burden of making a prima facie showing is not a heavy one. The party claiming the privilege "does not need to prove to a certainty that disclosure will result in chilling." *Pulte*, 2017 WL 1104670, at *4. Instead, the party need only show there is "some probability" of a chilling effect. *Id.*

### 1.    The disclosure of internal campaign communications and documents can chill associational rights.

Courts have explained how disclosure of political committees' internal communications and confidential communications with other groups can "chill[] the free exercise of political speech and association guarded by the First Amendment." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981). Compelled disclosure can chill the candor of internal campaign discourse, deter participation in campaign activities, and interfere with political groups' ability to operate effectively by revealing their strategy and tactics to opponents.

In *Perry*, the Ninth Circuit described how the compelled disclosure of internal communications and documents can have a "deterrent effect" on "participation in campaigns" and on "the free flow of information within campaigns." 591 F.3d at 1162. The court explained that "[i]mplicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private." *Id.*

6

Compelled disclosure can chill associational rights because it "mut[es]" this "internal exchange of ideas." *Id.* at 1163; *see also Pulte*, 2017 WL 1104670 ("If a person knows that her communications will be disclosed to an unintended audience in the future, she may be more cautious in her statements or refrain from speaking entirely.").

The party resisting disclosure in *Perry*—proponents of a ballot measure seeking to remove recognition of same-sex marriage in California—submitted declarations from individuals involved in the campaign "attesting to the impact compelled disclosure would have on participation and formulation of strategy." *Perry*, 591 F.3d at 1163. One declarant stated he would be "less willing to engage in such communications knowing that my private thoughts on how to petition the government and my private political and moral views may be disclosed simply because of my involvement in a ballot initiative campaign." *Id.* The court concluded that this declaration was "consistent with the self-evident conclusion that important First Amendment interests are implicated by the plaintiffs' discovery request" and "creates a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression." *Id.*

The D.C. Circuit has held that public disclosure of a national political party's "confidential internal materials . . . intrudes on the 'privacy of association and belief guaranteed by the First Amendment'" and "seriously interferes with internal group operations and effectiveness." *AFL-CIO v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)). The documents at issue in *AFL-CIO* included "detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies." *Id.* at 176–77. The parties claimed that disclosure would "directly frustrate" their "ability to

pursue their political goals effectively" because it would reveal to their opponents "activities, strategies and tactics" that would likely be used in future election cycles. *Id.* The D.C. Circuit agreed, holding that compelled disclosure of such materials would "frustrate those groups' decisions as to 'how to organize ... [themselves], conduct ... [their] affairs, and select ... [their] leaders,' as well as their selection of a 'message and ... the best means to promote that message.'" *Id.* at 177 (quoting *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 230–31 & n. 21(1989)). Consequently, the D.C. Circuit held that compelled disclosure of the parties' internal materials implicated "substantial First Amendment interests." *Id.* at 178.

2.   The NRSC has made a prima facie showing of a "chilling" of its associational rights.

The NRSC has submitted declarations in connection with this brief from the directors of three NRSC departments. These declarations "objectively suggest an impact on, or 'chilling' of, the [NRSC's] associational rights," *Perry*, 591 F.3d at 1160, and more than exceed the minimal required showing of "some probability" of a chilling effect, *Pulte*, 2017 WL 1104670, at *8. These declarations show that compelled disclosure would "seriously interfere[] with internal group operations and effectiveness" and jeopardize the NRSC's "ability to pursue [its] political goals effectively," *AFL-CIO*, 333 F.3d at 177–78, because it will inhibit "the free flow of information" within the NRSC and "mut[e] the internal exchange of ideas," *Perry*, 591 F.3d at 1162–63. Additionally, compelled disclosure of these documents will "deter[] . . . participation" because it will make it more difficult to attract and retain employees and consultants who fear their communications and confidential work product will be disclosed. *Id.* at 1162. Finally, disclosure of the NRSC's documents would reveal confidential "strategies and tactics" that would harm the NRSC's effectiveness and competitiveness in future election cycles. *AFL-CIO*, 333 F.3d at 177. That is particularly true because Blankenship is a political opponent of the

NRSC and may run again in opposition to a Republican senatorial candidate, as he did in 2018. The NRSC has more than exceeded the minimal required showing in order to validly claim the First Amendment privilege applies.

The first declaration, submitted by NRSC Political Director Betsy Ankney, attests to the chilling effect that disclosure would have. She explains that the documents at issue include email correspondence containing candid opinions and advice from NRSC staff and consultants directly related to Senate candidates and campaigns. Ankney Decl. ¶ 8. They include confidential and detailed analyses of polling results and the latest developments in Senate races across the country. *Id.* They provide insight into how the NRSC makes decisions in terms of devoting resources and attention to particular races. *Id.* ¶ 7. She attests that disclosure will cause her to hesitate to offer candid thoughts about Senate candidates and campaigns in the future and to sometimes refrain entirely from offering her opinions. *Id.* She attests that many of the NRSC's current and future employees, as well as trusted advisors and consultants, will also be more cautious with respect to their statements pertaining to the NRSC's campaign strategy and messaging. *Id.* ¶¶ 7, 10. Moreover, she believes public disclosure of the withheld documents could discourage some vendors and individuals from working with or for the NRSC in the future. *Id.* ¶ 11. Finally, she attests that disclosure of certain documents could prejudice the NRSC in this and future election cycles because they reveal private campaign strategy, proprietary polling information, and other information relevant to internal strategic decision-making. *Id.* ¶ 8.

The NRSC's Polling Director, Jessie Connelly, has attested that the withheld documents include private polling information never intended for public disclosure. Connelly Decl. ¶ 5. Compelled disclosure of this private polling information would reveal polling questions, methodology, and results as well as detailed analyses of and interpretive approaches to polling

data. *Id.* Her declaration demonstrates that disclosure of private polling information and related correspondence would chill the candor of internal campaign communications regarding the formulation of the NRSC's strategy and messaging. *Id.* ¶ 6. Compelled disclosure would also reveal to the public and to political opponents important proprietary information about the NRSC's polling operations that could prejudice it in future election cycles. *Id.* ¶ 7.

The NRSC's Research Director, Jeff Snow, attests that it is standard practice of the NRSC to conduct research on all plausible candidates or potential candidates in a Senate Republican primary. Snow Decl. ¶ 4. The primary purpose of conducting such background research is so that the NRSC can know and assess any potential vulnerabilities that its candidates might have that could potentially be exploited by a Democratic opponent in the general election. *Id.* Ahead of the 2018 West Virginia Republican Senate primary election, the NRSC conducted background research on Patrick Morrisey, Evan Jenkins, and Don Blankenship. *Id.* ¶ 5. The NRSC's research into its potential candidates is an essential part of its campaign strategy, and public disclosure of these documents would be harmful to the integrity and effectiveness of the process going forward. *Id.* ¶¶ 4, 6. The process involves research into controversial aspects of candidates' pasts and the divulgence of highly sensitive information. *Id.* ¶ 6. Requiring public disclosure will negatively affect this process, because there will likely be less willingness to engage in such unrestrained investigations into candidates' backgrounds. *Id.* Moreover, the process benefits from the cooperation of candidates and prospective candidates, who oftentimes submit responses to questionnaires containing sensitive information. *Id.* ¶ 7. Candidates and prospective candidates will likely be less willing to cooperate in the research process if they know such information could potentially be disclosed in subsequent litigation. *Id.*

10

The chilling effect is particularly acute with respect to Blankenship's demand for documents, because he is now a self-avowed political opponent of the NRSC. After he lost the 2018 West Virginia Republican primary, Blankenship immediately sought to run against the Republican Party's nominee, Patrick Morrisey, in the general election as a Constitution Party candidate.[2] Indeed, he is now the Constitution Party's candidate for President.[3] And, as this litigation demonstrates, Blankenship is an outspoken opponent of the "GOP establishment," of which he considers the NRSC to be a part. *See* Am. Compl. ¶ 14. It would harm the NRSC for any of its withheld documents to be disclosed publicly, but it would be particularly harmful if the NRSC were compelled to disclose documents, including deep background files, directly to one of its political opponents and the subject of the backgrounders. Ankney Decl. ¶ 8; Connelly Decl. ¶ 5; Snow Decl. ¶ 8; *see, e.g.*, *AFL-CIO*, 333 F.3d at 177 (revealing political party's "activities, strategies and tactics" to opponents implicates "substantial First Amendment interests"); *Pulte*, 2017 WL 1104670, at *11 (disclosure of communications that "could illuminate the groups' strategies to their political opponents" raises "substantial First Amendment concerns").

Although a protective order has been entered in this case, Doc. 495, a protective order "cannot eliminate these threatened harms." *Perry*, 591 F.3d at 1164. That is particularly true when the disclosure is made directly to a party who is a political opponent, who obviously can review the sensitive material regardless of the protective order. Moreover, Blankenship violated the terms of the protective order in his briefing on this very motion. Despite the privilege log being submitted with a "confidential" tag affixed to it, he revealed the names of senders and

---

[2] Alex Thomas, *Blankenship files to run for Senate, this time with Constitution Party*, Metro News, July 24, 2018, https://wvmetronews.com/2018/07/24/blankenship-files-to-run-for-senate-this-time-with-constitution-party/.

[3] *See* https://donblankenship.com/.

recipients of communications listed in the privilege log without conferring with the NRSC beforehand. *See* Supp. Br. 11–12. Blankenship's willingness to flout this Court's protective order underscores that the NRSC cannot rely on it to protect the privacy of its communications and should not be forced to hand its private communications over to a political opponent.

3.    Blankenship's Arguments Against Application of the Privilege Are Not Convincing.

Blankenship's arguments opposed to the NRSC's First Amendment privilege claim are unavailing. At bottom, Blankenship argues that the NRSC cannot make its prima facie showing that disclosure of the withheld documents would chill the NRSC's associational rights, because he claims no "personal and/or private views are at issue." Supp. Br. 10. He suggests that the NRSC does not have associational rights with respect to its internal communications because it has publicly acknowledged its mission of "electing Republicans to the United States Senate" and "publicly advocates Republican principles." *Id.* He also contrasts the communications at issue here with the communications at issue in *Perry*, suggesting that the subject matter underlying that case (same-sex marriage) was more controversial than political viewpoints expressed by the NRSC. *Id.* at 9. Blankenship also asserts that the declarants in *Perry* were "regular citizens" who feared disclosure of their "personal political and moral views." *Id.* This is in contrast to his description of the NRSC as a "professional political organization" "headed and represented by senators and skilled political operatives." *Id.* at 9–10.

As an initial matter, the mere fact that the NRSC publicly espouses Republican policies is of no consequence. "It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments." *Eu*, 489 U.S. at 224. Moreover, a central purpose of the First Amendment privilege is to protect the privacy of "internal campaign communications" related to the "formulation of campaign strategy and messages"

12

precisely so that political organizations can have candid internal discussions without worrying that their communications will be publicized. *Perry*, 591 F.3d at 1165 n.12. That is why "the official Proposition 8 campaign committee" publicly advocating for adoption of Proposition 8 sought the protection of its internal communications in *Perry*. *Id.* at 1152; *see also AFL-CIO*, 333 F.3d at 176–77 (Democratic National Committee could claim First Amendment privilege).

Moreover, Blankenship's suggestion that the issue of same-sex marriage that was underlying *Perry* was more controversial than anything the NRSC would be discussing internally is immaterial and incorrect. Supp. Br. 9. It is immaterial because any alleged differences between the subject matter of the speech "speaks to the strength of the First Amendment interests asserted, not to their existence." *AFL-CIO*, 333 F.3d at 176. It is incorrect because the NRSC's internal communications relate to heated Senate campaigns and the most salient issues of the day, many of which are highly controversial. Ankney Decl. ¶ 5. In any event, the declarations submitted by three NRSC directors demonstrate that public disclosure of the withheld documents would chill associational rights and inhibit frank internal discussions of the issues. Ankney Decl. ¶ 8; Connelly Decl. ¶ 7; Snow Decl. ¶ 9 That is sufficient for the NRSC to make its prima facie showing that the First Amendment privilege applies.

Blankenship's description that *Perry* involved the "personal political and moral views" of "regular citizens" similarly does not undercut the NRSC's privilege claim. First, that description of who filed declarations in *Perry* is flatly incorrect, as one of the declarants was the campaign committee's professional campaign manager who was considered one of the top public affairs and communications consultants in the country and whose public affairs firm was retained by the committee to run the campaign. *See* Doc. 187-9 ¶¶ 3–4, *Perry v. Schwarzenegger*, No. 09-CV-2292 (N.D. Cal. Sept. 15, 2009) (Decl. of Frank Schubert). And he expressed serious

concern with the disclosure of communications regarding political strategy, not just those involving personal moral views. *Id.* ¶ 9. Second, it is not the First Amendment rights of individual employees that the NRSC is asserting, but its own associational rights. Blankenship offers no authority for the notion that a political organization's "internal campaign communications" are less protected when it is political professionals who engage in communications regarding the "formulation of [its] campaign strategy and messages." *Perry*, 591 F.3d at 1165 n.12.

Blankenship also suggests that "internal campaign communications" can apply only to those communication strictly among NRSC employees and cannot apply to vendors and others who are not NRSC employees. Doc. 503 ("Mot. to Compel") ¶ 51. But the freedom of association does not depend on such formalistic distinctions. The NRSC retains numerous vendors and consultants for the express purpose of discussing confidential matters related to campaign strategy and messaging. *Cf. Perry*, 591 F.3d at 1153 (protecting communications with "political consultants"). The NRSC also communicates with Republican candidates, officeholders, and organizations in service of its mission to elect Republican Senate candidates and promote Republican policies. These entities and individuals, whatever level of formal affiliation they have, associate for the purposes of promoting their shared political goals. *See Int'l Union v. Nat'l Right to Work Legal Defense and Educ. Found., Inc.*, 590 F.2d 1139, 1147 (D.C. Cir. 1978) (First Amendment protection "extends not only to the organization itself, but also to its staff, members, contributors and others who affiliate with it"); *Machinists Non-Partisan Political League*, 655 F.2d at 388 (demand for "communications among various [draft-Kennedy] groups" had "potential for chilling the free exercise of political speech and association guarded by the First Amendment"); *Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 454

(D.D.C. 2002) (First Amendment protects parties' "strategic communications on policy issues with other environmental advocacy groups"); *Pulte*, 2017 WL 1104670, at *11 ("The citizen groups have an interest in the non-disclosure of the communications it had with third parties.").

Finally, Blankenship maintains that the NRSC's production of documents has resulted in waiver of the First Amendment privilege because the documents that were produced relate to the "same subject matter[s]" as the withheld documents. Supp. Br. 13–14. But the produced documents were not confidential and thus were not privileged, and their production cannot result in waiver. The cases Blankenship cites stand for the unremarkable proposition that disclosure of a *privileged* document results in a privilege waiver for other documents on the same subject. *See id.* at 14. Blankenship claims that the NRSC disclosed internal polling information, but in fact the NRSC produced only *public* polling information. *See id.* at 13 (citing Bates Nos. NRSC 4, 9, 160-161); Ankney Decl. ¶ 13. Likewise, the "Political Update" slideshows that the NRSC produced were created for an external audience and not for any confidential purpose that would implicate the NRSC's associational rights. *See* Supp. Br. 13–14 (citing Bates Nos. NRSC 162-385); Ankney Decl. ¶ 13. Additionally, the documents that the NRSC produced regarding Mr. Blankenship's criminal proceedings and residence are public records, which makes them entirely unlike the confidential research backgrounders identified on the privilege log, which are internal work product. Supp. Br. 14 (citing Bates Nos. NRSC 12-159); Snow Decl. ¶ 5. In short, the NRSC has not produced any privileged documents and thus has not waived the privilege.

## B. Blankenship Has Not Shown That Any Document Is Essential To Proving His Conspiracy Claim.

Once a party has made a prima facie showing that disclosure would chill associational rights, "the evidentiary burden shifts to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance that infringement." *Perry*, 591 F.3d at 1164. "[T]he party seeking

the discovery must show that the information sought is *highly relevant* to the claims or defenses

in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil

Procedure 26(b)(1)." *Id.* at 1161 (emphasis added). In other words, the information must go to

the "heart of the lawsuit." *Wyoming*, 208 F.R.D. at 455. As Blankenship concedes, once the court

has found the First Amendment privilege applies, Blankenship is entitled only to those

documents that are "essential" to his conspiracy claim. Supp. Br. 10. Thus, Blankenship is

required "to prove that the information sought is of *crucial relevance* to [his] case" and that the

information is "*actually needed* to prove [his] claims." *Pulte*, 2017 WL 1104670, at *4

(emphases added).

Here, none of the withheld documents meets the "heightened relevance standard." *Perry*,

591 F.3d at 1164. Blankenship does not claim that the NRSC itself said anything defamatory, but

instead claims that the NRSC conspired with *others* to defame him. The Amended Complaint

identifies only two alleged "co-conspirators": 35th PAC and Kevin McLaughlin. Am. Compl.

¶ 233. Accordingly, to prove a conspiracy, Blankenship will have to show that the NRSC entered

"an agreement" with one of these two parties to commit defamation by deliberately

mischaracterizing his criminal conviction as a "felony" instead of a misdemeanor. *Tucker v.

Thomas*, 853 F. Supp. 2d 576, 594 (N.D. W. Va. 2012). But none of the documents he seeks has

any bearing on that issue. As the privilege log shows, none of the documents involves any

communication with McLaughlin and 35th PAC. Nor does the privilege log reference any

communications with Senator Mitch McConnell or any of the others that the Court hypothesized

could be involved in the purported "conspiracy." *See* Doc. 398 at 53–54. Indeed, none of the

documents says anything about any purported plan to refer to Blankenship as a "felon" or

otherwise to defame him. (This is unsurprising, because the supposed "conspiracy" to commit defamation is purely a figment of Blankenship's imagination.)

In addition, none of the communications referred to in Blankenship's supplemental brief (at 11–12) can support his conspiracy claim for a separate reason: All of these communications were among NRSC employees and consultants, Ankney Decl. ¶ 12, and a corporation cannot "conspire" with its own agents. *See, e.g.*, *Ridgeway Coal Co. v. FMC Corp.*, 616 F. Supp. 404, 409 (S.D. W. Va. 1985). Accordingly, the communications and documents that Blankenship seeks are not at all relevant to proving his conspiracy claim, let alone "of crucial relevance" to his case. *Pulte*, 2017 WL 1104670, at *4.

Blankenship makes only one argument for why the documents he seeks are "essential." He says that the "more than four hundred documents that pertain to Mr. Blankenship [are] evidence enough, standing alone, to show that the NRSC was deeply involved in opposing his candidacy." Supp. Br. at 11. But it is not at all surprising that the NRSC would have many documents pertaining to a Senate candidate in a marquee Senate race. The NRSC communicated about all 33 Senate races in 2018. Ankney Decl. ¶ 8. It gathered extensive information on candidates that it supported and opposed, and thus the mere fact that it has documents pertaining to Blankenship does not suggest it "was deeply involved in opposing his candidacy." In any event, documents showing political opposition to Blankenship do not have any "crucial relevance" to proving his claim of an unlawful conspiracy. *Pulte*, 2017 WL 1104670, at *4. It is obviously not illegal for a political organization to oppose someone's candidacy; such opposition is constitutionally protected. Blankenship's conspiracy claim is much narrower—that the NRSC conspired with others to *defame* Blankenship by falsely calling him a "felon." On *that* issue, the documents in question have no relevance whatsoever, much less "crucial relevance."

Although Blankenship's opening brief does not say so, he may try to argue that political opposition could show a "motive" to defame him. But that type of generic relevance is far too "attenuated" to meet the "heightened relevance standard" that the First Amendment imposes, *Perry*, 591 F.3d at 1164–65, which requires the information sought to go to the "heart of the lawsuit," *Wyoming*, 208 F.R.D. at 455. If the rule were otherwise, then political opponents could *never* invoke the privilege against each other, which is precisely when the privilege is most urgently needed. This would effectively destroy the privilege.

Blankenship identifies three categories of documents that he deems essential to his conspiracy claim, but none of them is even remotely suggestive that the NRSC entered an unlawful agreement to commit defamation, let alone "highly relevant" to that issue. *Perry*, 591 F.3d at 1161. First, he claims a need for a "Research backgrounder on Blankenship." Supp. Br. 11. But the NRSC conducts research on virtually all senatorial candidates. Snow Decl. ¶ 4. Conducting internal research is not indicative of any unlawful agreement to defame anyone, and it is far too "attenuated" from Blankenship's conspiracy claim to qualify as highly relevant. *Perry*, 591 F.3d at 1165.

Second, Blankenship claims a need for "polling information." But the fact that the NRSC conducted internal polling in connection with a major Senate race and discussed it internally is also standard practice, and again is not remotely indicative of any unlawful conspiracy. Connelly Decl. ¶¶ 3–4. Blankenship has not shown that this information is "actually needed" to prove his claim. *Pulte*, 2017 WL 1104670, at *4.[4]

---

[4] The internal polling referenced in the privilege log is not the allegedly defamatory "push poll" described in Blankenship's complaint. *See* Supp. Br. 5; Connelly Decl. ¶ 9.

Third, Blankenship claims a need for "regular updates." Supp. Br. 11. This is apparently a reference to the internal "weekly updates" that the NRSC regularly compiled containing detailed and confidential information regarding all Senate races. Ankney Decl. ¶ 8. But again, Blankenship does not and cannot explain how such documents are "essential" to proving that the NRSC entered a "conspiracy" with anyone to defame him.

Blankenship also mischaracterizes *Perry* by claiming that it allows a plaintiff to automatically overcome the First Amendment privilege for documents that are not available from any other source. Supp. Br. 10. That is incorrect. In fact, *Perry* held that even though certain internal documents were not available from any other source, they were still privileged because they were too "attenuated" from the central issue in the case to meet the "heightened relevance standard" that would justify compelled disclosure. 591 F.3d 1164–65. The court simply noted that ***other*** relevant information could be obtained elsewhere. *Id*. The court did not suggest that the inability to obtain private internal communications from another source—which, of course, is always the case for private internal communications—allows a party to avoid the "heightened relevance standard" altogether. The unavailability of information from another source is immaterial where, as here, the information sought is not of "crucial relevance" to the case or "actually needed" by the plaintiff to prove his case. *Pulte*, 2017 WL 1104670, at *4.

If the court has any doubt about the lack of relevance here, it need not take the NRSC's word for it. The NRSC would be happy to submit the 424 documents at issue for *in camera* review. *See, e.g.*, *Ted Cruz for Senate v. FEC*, No. 19-CV-908, 2020 WL 1509165, at *6 (D.D.C. Mar. 30, 2020). This would allow the court to assess for itself whether any of them meet the "heightened relevance" standard before compelling the NRSC to disclose them to one of its most vociferous political opponents.

\*                    \*                    \*

Finally, in balancing Blankenship's need for the withheld documents, the Court must consider whether Blankenship "is seeking the information out of an actual need or because of improper ulterior motives." *Pulte*, 2017 WL 1104670, at \*8. Discovery in this case is ostensibly meant to prove a conspiracy among the NRSC, 35th PAC, and Kevin McLaughlin. Yet none of the 55 requests for documents even mentions McLaughlin, one of the two named co-conspirators. *See* Doc. 503-1. While neglecting to specifically ask for communications with an alleged conspirator, Blankenship makes numerous requests for documents related to Donald Trump Jr.'s Twitter, communications with "West Virginia based businessperson(s) and/or coal operators," and other documents far afield from his conspiracy claim against the NRSC. *Id.* at 21–25, 30. The true purpose of Blankenship's discovery requests should be obvious: he is seeking to punish his perceived political enemies through burdensome and intrusive discovery.

## CONCLUSION

The NRSC respectfully requests that the Court deny Plaintiff's motion to compel and deny his request for an award of attorney's fees and expenses.

Dated: August 24, 2020                    */s/Melissa Foster Bird*
                                          Melissa Foster Bird. Esq.
                                          Nathan R. Hamons, Esq.
                                          NELSON MULLINS RILEY &
                                          SCARBOROUGH
                                          P. O. Box 1856
                                          Huntington, WV 25719-1856
                                          (304) 526-3500
                                          (304) 526-3599 (FAX)
                                          melissa.fosterbird@nelsonmullins.com
                                          nathan.hamons@nelsonmullins.com

                                          Michael A. Carvin
                                          Anthony J. Dick

20

Stephen J. Kenny
JONES DAY
51 Louisiana Ave. NW
Washington, DC, 20001-2113
Tel.: 202-879-3939
Fax: 202-626-1700
macarvin@jonesday.com

***Attorneys for Defendant National
Republican Senatorial Committee***

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

DON BLANKENSHIP,

        *Plaintiff*,

                                       Case No. 2:19-cv-00236

v.

ANDREW NAPOLITANO, *et al.*,

        *Defendants*.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that the foregoing ***"National Republican Senatorial Committee's Opposition to Plaintiff's Motion to Compel"*** was served on all counsel of record through the CM/ECF system on the 24th day of August, 2020.


                                     /s/ Melissa Foster Bird_____