UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


DON BLANKENSHIP,

        Plaintiff,

v.                              Civil Action No. 2:19-cv-00236

FOX NEWS NETWORK, LLC;
CABLE NEWS NETWORK, INC.;
MSNBC CABLE, LLC; 35th INC.;
WP COMPANY, LLC d/b/a The Washington Post;
MEDIAITE, LLC; FISCALNOTE, INC. d/b/a Roll Call;
NEWS AND GUTS, LLC; THE CHARLESTON GAZETTE-MAIL;
AMERICAN BROADCASTING COMPANIES, INC.; TAMAR AUBER;
GRIFFIN CONNOLLY; ELI LEHRER; and
DOES 1-50 INCLUSIVE,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending are the motions for summary judgment filed by

the following defendants on May 24, 2021: News & Guts, LLC

("N&G") (ECF 880); MSNBC Cable, LLC ("MSNBC") (ECF 882); Cable

News Network, Inc. ("CNN") (ECF 884); WP Company LLC (the

"Washington Post") (ECF 886); American Broadcasting Companies,

Inc. ("ABC") (ECF 888).  Also pending are the motions for

summary judgment filed by defendants Fox News Network, LLC ("Fox

News") (ECF 890); Eli Lehrer (ECF 898); Mediaite, LLC

("Mediaite") and Tamar Auber (ECF 900); Griffin Connolly and

FiscalNote, Inc. ("FiscalNote") (ECF 903), all on June 7, 2021,

and H.D. Media, LLC ("HD Media"), publisher of the Charleston

Gazette-Mail[1], on June 21, 2021 (ECF 945).[2]


## I.  Background


Mr. Blankenship instituted this action on March 14,

2019, in the Circuit Court of Mingo County, asserting defamation

and false light invasion of privacy claims against numerous

media organizations, reporters, and others.  See ECF 1.  This

action was removed based on diversity jurisdiction.  See id.; 28

U.S.C. § 1332.  On April 9, 2019, Mr. Blankenship amended his

complaint.  See ECF 14.  The operative amended complaint alleges

the following.


## A.  General Allegations


After an explosion in a West Virginia mine resulted in

the death of twenty-nine miners, the United States Government

---

[1] Mr. Blankenship's amended complaint misidentifies the
Charleston Gazette-Mail as the owner of the Charleston Gazette
and incorrectly names the Charleston Gazette-Mail as a defendant
in this action.  See ECF 14 71.  HD Media is the publisher of
the Charleston Gazette-Mail.  See ECF 946 at 1 n.1.  HD Media
states that it has informed Mr. Blankenship of the error but no
corrective action has been taken.  See id.  When necessary, the
court will refer to the defendant properly as HD Media
throughout this opinion.

[2] The court at times refers to these defendants collectively
as the "moving defendants" throughout this opinion.

initiated an investigation into the cause of the explosion,
focusing on Massey Energy, which operated the mine, and Mr.
Blankenship, who was Massey Energy's chief executive officer.
See id. ¶¶ 7-8, 136-41.  While Mr. Blankenship was not charged
with the miners' deaths, the Government later charged him with
three felonies, as well as one misdemeanor for conspiracy to
violate federal mine safety laws.  See id. ¶ 141.  On December
3, 2015, a jury acquitted Mr. Blankenship of the felony charges
but found him guilty of the misdemeanor offense.  See id. ¶ 143.
As a result, Mr. Blankenship was sentenced to one year in prison
and was released in the spring of 2017.  See id. ¶¶ 144-45.

        In January 2018, Mr. Blankenship announced his
campaign to run as a Republican for a United States Senate seat
in West Virginia.  See id. ¶ 146.  Mr. Blankenship lost his bid
for the Republican party's nomination in the primary election on
May 8, 2018.  See id. ¶ 190.  Mr. Blankenship alleges that media
coverage was responsible for his loss due to defamatory
statements referring to him as a "felon" or "convicted felon,"[3]
despite that he was acquitted of the felony charges and was only
convicted of the misdemeanor offense.  See id. ¶¶ 152-190.  Mr.
Blankenship further alleges that there was an organized effort
to defeat his campaign, in part through the defamatory media

---

    [3] The exact reference varies among the defendants.

coverage, see id. ¶¶ 150-90, which continued after the primary election.  See id. ¶¶ 191-221.

Mr. Blankenship alleges that these defamatory statements injured his reputation, prevented him from pursuing other business opportunities, and caused him to lose in the primary election.  See id. ¶¶ 24, 190.  In addition, Mr. Blankenship alleges that many of these statements were made in conjunction with reference to the mine disaster and therefore had the additional effect of falsely attributing to him responsibility for murder.  See id. ¶¶ 23, 228, 242.

B.  News and Guts, LLC

N&G is "a news, media, and production company created by journalism icon Dan Rather."[4]  Id. ¶ 53; see ECF 405 ¶ 53.  On May 7, 2018, the day before the Republican primary election, N&G published an article titled "Don Blankenship: A Felon, A Racist and A Possible GOP Senate Nominee."  ECF 905-2 at 2 (emphasis added); see also ECF 880-1 ¶ 3.  The article generally discusses facets of Mr. Blankenship's campaign prior to the primary election and states that

---

[4] Mr. Rather was named as a separate defendant in this action.  See ECF 14 at 3, 27.  The court dismissed Mr. Rather as a defendant without prejudice on October 7, 2019, after Mr. Blankenship and Mr. Rather filed a joint stipulation of dismissal.  See ECF 349; ECF 350.

> Blankenship has also done time; his company, Massey
> Energy, was responsible for the fatal explosion at the
> Upper Big Branch coal mine that left 29 workers dead.
> He served one year in prison for the catastrophe.

ECF 905-2 at 2.[5]  The byline identifies the author as "News and

Guts," id., and the parties do not identify any individual who

authored it.

C.  MSNBC Cable, LLC

MSNBC is a twenty-four-hour cable news network, owned

by NBCUniversal Media, which is a subsidiary of Comcast

Corporation, a national telecommunications and mass-media

conglomerate.  See ECF 14 ¶ 35.  On April 16, 2018, Chris Hayes,[6]

an MSNBC reporter and host of the program All In With Chris

Hayes ("All In"), posted the following on his personal Twitter

account @chrislhayes: "The GOP may very well nominate a

felonious coal baron found responsible for dozens of miners'

deaths to [sic] as their senate nominee in WV."  ECF 882-5 at 6

---

[5] A caption to a photograph within the article similarly
states that Mr. Blankenship "is the former chief executive of
the Massey Energy Company where an explosion in the Upper Big
Branch coal mine killed 29 men in 2010" and that he "served a
one-year sentence for conspiracy to violate mine safety laws."
ECF 905-2 at 2.

[6] Mr. Hayes was dismissed as an individual defendant in this
matter due to lack of personal jurisdiction in the court's March
31, 2020, memorandum opinion and order.  See ECF 398.

(emphasis added); ECF 14 ¶ 169.  The tweet referred to the West Virginia primary and Mr. Blankenship.  ECF 883 at 6.

On April 23, 2018, during a live broadcast on his show All In, Mr. Hayes stated the following while discussing Mr. Blankenship's campaign advertisements: "That was a campaign ad in the year of our Lord 2018 for convicted felon Don Blankenship who spent a year in jail for his role in a mine disaster that killed 29 people, calling for Hillary Clinton to be locked up in a campaign ad in 2018."  Id. at 23 (emphasis added); ECF 14 ¶ 170.

On May 4, 2018, Joy Reid,[7] served as the substitute-host for Mr. Hayes on the MSNBC program All In.  While discussing Mr. Blankenship's comments on Senator Mitch McConnell, Ms. Reid stated:

> Coal baron and convicted felon Don Blankenship who
> spent a year in federal prison for his role in a 2010
> mine explosion that killed 29 people and who's still
> on probation has been trying to get Republican votes
> in the West Virginia Senate primary by going after his
> own party's Senate Leader Mitch McConnell, nicknaming
> him "Cocaine Mitch" and referring to McConnell's
> father-in-law as a quote, "China person."

ECF 882-7 at 53-54 (emphasis added); ECF 14 ¶ 172.

---

[7] Ms. Reid was dismissed as an individual defendant in this matter due to lack of personal jurisdiction in the court's March 31, 2020, memorandum opinion and order.  See ECF 398.

During the May 9, 2019, broadcast of <u>All In</u>, Mr. Hayes discussed Mr. Blankenship's loss in the primary election.  ECF 882-5 at 40-41.  He began the segment on Mr. Blankenship by stating:

> [P]rimary day in America has come and gone, as has the brief and glorious political career of Don Blankenship, at least for now. He is, of course, the former coal company executive who is [sic] released from prison last year after serving a year for mine safety violations connected to an explosion that killed 29 people.

<u>Id.</u> at 40.  After discussing Mr. Blankenship's criticisms of Senator Mitch McConnell during the campaign, Mr. Hayes ended the Blankenship segment by stating "But thus endeth the brief and unsuccessful senate bid of <u>convicted</u> <u>felon</u> Don Blankenship." <u>Id.</u> at 41 (emphasis added); <u>see</u> <u>also</u> ECF 14 ¶ 191.

D.  <u>Cable News Network, Inc.</u>

CNN is a national twenty-four-hour news network.  <u>See</u> ECF 14 ¶ 33.  On April 29, 2018, CNN host and chief political correspondent Dana Bash, introduced a segment on the program <u>CNN</u> <u>Newsroom</u> regarding the Republican Primary in West Virginia.  <u>See</u> ECF 885 at 7.  Bash opened the segment by discussing Mr. Blankenship's conviction and explained that Mr. Blankenship "reminds us" that his conviction "was just a misdemeanor."  <u>Id.</u>; <u>see</u> <u>also</u> ECF 884-19 at 2.  After playing a video clip of an interview with Mr. Blankenship, Ms. Bash introduced two guests:

Alex Isenstadt, a Politico reporter, and Kevin McLaughlin, a
Republican Party strategist.  See id.; see also ECF 14 ¶ 160.
During the live discussion, Mr. McLaughlin made the following
comment about Mr. Blankenship: "Well, I mean, pick your poison
with this guy, right?  He doesn't live in West Virginia, he's a
convicted felon."  ECF ¶ 160 (emphasis added); see also ECF 884-
19 at 5.

Mr. McLaughlin is not an employee of CNN, nor did he
work for CNN "in any capacity" or receive any compensation for
his guest appearance.  ECF 884-20 ¶ 6; see also ECF 884-21 at 6-
7.  He was invited onto the program by Ms. Bash "for a live,
unscripted discussion."  Id.; see also ECF 884-21 at 7-8.

On May 2, 2018, political commentator Sarah Elizabeth
Cupp hosted a round-table discussion about various political
topics, including primary elections in multiple states, on the
television program S.E. Cupp Unfiltered on CNN's subsidiary
network HLN.  See ECF 14 ¶ 171; ECF 885 at 9.  When discussing
the West Virginia primary election, Ms. Cupp mentioned that Mr.
Blankenship had "served a year in prison" and then played a clip
of Mr. Blankenship speaking at the May 1, 2018, primary debate
where he stated the following about the Justice Department:

> It was clear from the beginning to the end that it was
> a fake prosecution.  I've had a little personal
> experience with the Department of Justice; they lie a

> lot, too.  So, you know, it's -- it's one of those
> things where when you know what really goes on in the
> Department of Justice, you -- you wonder where --
> where this country is going.  It's really crazy.

ECF 884-27 at 12.  Ms. Cupp then responded "You want to talk

about the Justice Department, I know something about the Justice

Department; that's because you're a convict, you're a <u>felon</u>.

Oh, my God."  <u>Id.</u> (emphasis added); ECF 14 ¶ 171.  Ms. Cupp has

never been an employee of CNN.  <u>See</u> ECF 884-26 ¶ 2.  Instead,

her work as a CNN contributor and commentator has been as an

independent contractor.  <u>Id.</u> at ¶¶ 1, 2.  Her reference to Mr.

Blankenship as a felon was an unscripted remark.  <u>Id.</u> at ¶ 6.

On May 7, 2018, the host of <u>CNN Tonight</u>, Don Lemon,

addressed several topics of national interest.  Approximately

forty (40) minutes into the show, Mr. Lemon introduced a segment

about the West Virginia Republican primary, noting that

President Trump opposed Mr. Blankenship's candidacy.  <u>See</u> ECF

884-23 at 2.  Mr. Lemon then introduced three commentators,

including Joe Lockhart, a former White House Press Secretary and

CNN political contributor.

During the discussion, Mr. Lockhart commented on

President Trump's tweet urging voters to vote against Mr.

Blankenship:

> What's striking here is in Trump's tweet this morning,
> he didn't say anything about Roy Moore and his
> personal problems.  He didn't say don't vote for

Blankenship because he went to jail, he's a <u>convicted felon</u>, he's a racist, and he's crazy.  He said, vote for the other guys because we don't want to lose the seat.

<u>Id.</u> at 6 (emphasis added); ECF 14 ¶ 179.  Like Ms. Cupp, Mr. Lockhart has never been an employee of CNN but instead is an independent contractor.  <u>See</u> ECF 884-24 at ¶ 2.  His remarks during the discussion were unscripted.  <u>Id.</u> at ¶ 5.

On May 8, 2018,[8] Ms. Cupp again covered primary elections across the country on <u>S.E. Cupp Unfiltered</u>.  <u>See</u> ECF 884-28.  When discussing the West Virginia primary, Ms. Cupp and political analyst David Drucker, discussed Mr. Blankenship's candidacy.  <u>Id.</u>  Mr. Drucker stated that Mr. Blankenship was "found guilty of conspiracy to avoid mine safety standards in . . . federal court" after a mining accident killed twenty-nine coalminers.  <u>Id.</u> at 4.  Following a commercial break, Ms. Cupp commented, "[i]n case you missed it, a former coal baron and <u>convicted felon</u> is running for senate in West Virginia."  <u>Id.</u> at 8; ECF 14 ¶ 174.

E.  <u>The Washington Post</u>

On May 8, 2018, the Washington Post published an op-ed authored by Dana Milbank titled "Trump's election is no

---

[8] Mr. Blankenship's complaint mistakenly states this broadcast took place on May 7, 2018.  <u>See</u> ECF 14 ¶ 174.

aberration."  ECF 886-19; ECF 14 ¶ 189.  The op-ed discusses Mr. Blankenship's run for Senate and first refers to him as "a disgraced coal baron who spent a year in jail after a mine explosion killed 29 workers."  Id.  The op-ed goes on to mention numerous Republican politicians, party leaders, and political groups before stating as follows:

> Now we have Blankenship, Roy Moore, Joe Arpaio and a proliferation of name-calling misfits and even <u>felons</u> on Republican ballots.  They are monsters created by the GOP, or rather the power vacuum the GOP has become.

Id. (emphasis added).  The online version of the op-ed includes a hyperlink on the phrase "even felons," linking to another article titled "Crimes are no longer a disqualification for Republican candidates."  ECF 886-21 at 2; ECF 886-22.  The hyperlinked article begins by discussing former New York Congressman, Michael Grimm, "a felon . . .".  ECF 886-22 at 2. The hyperlinked article goes on to accurately report that Mr. Blankenship was convicted of a "misdemeanor . . . for conspiring to violate mine safety laws, which sent him to prison for a year."  Id. at 4.

On July 25, 2018, the Washington Post published an online article authored by Jenna Johnson and Josh Dawsey titled "Republican primary candidates have one goal: Securing Trump's endorsement or denying it to an opponent."  ECF 886-24.  The

same article was subsequently republished in print under the headline "GOP primary candidates joust for Trump's endorsement" on July 27, 2018.  ECF 886-25.  In the only paragraph about the West Virginia primary, the article states: "A day before West Virginia's Senate primary, Trump urged Republicans to vote for either Rep. Evan Jenkins or Attorney General Patrick Morrisey but not Blankenship, a former coal mine owner and <u>felon</u>."  ECF 886-24; ECF 886-25; ECF 14 ¶¶ 218, 221.  The Washington Post issued a correction to this article, both online and in print, after the filing of this lawsuit when it was made aware of the error.  <u>See</u> ECF Nos. 886-28; 886-29.

On August 9, 2018, the Washington Post published an online blog post authored by Amber Phillips stating that:

> Three <u>convicted</u> <u>felons</u> have run or are running for office this year.  Two have lost — in New York, former congressman Michael Grimm vying for his old seat, and in West Virginia, former coal baron Don Blankenship. Former Arizona sheriff, Joe Arpaio[9] is still in the running for Senate in Arizona, and he has been embraced by the White House.  Trump even pardoned him.

ECF 886-30 (emphasis added); ECF 14 ¶ 221.  Upon becoming aware of the error following the filing of this lawsuit, the

---

[9] The court notes that "Mr. Arpaio's contempt of court conviction was only a misdemeanor, [not a felony,] and President Trump pardoned him before he was sentenced."  <u>Arpaio v. Zucker</u>, 414 F. Supp. 3d 84, 87 n.1 (D.D.C. 2019).

Washington Post issued a correction to this story.  <u>See</u> ECF 886-32.

F.  <u>American Broadcasting Companies, Inc.</u>

On July 23, 2018, ABC News published an online article, authored by former ABC News reporter John Verhovek, titled "Despite 'sore loser' law, Don Blankenship trying third party bid for US Senate in West Virginia."  <u>See</u> ECF 888-13.  The article's lead sentence provides:

> Don Blankenship, the former coal baron and <u>convicted felon</u> who finished third in the West Virginia Republican Primary in May, is wading back into the state's U.S. Senate race, this time attempting filing paperwork to run as a member of the Constitution Party.

<u>Id.</u> (emphasis added).  The article goes on to explain that Mr. Blankenship "was convicted in 2015 for conspiracy to violate mine safety and health standards in the aftermath of the 2010 Upper Big Branch Mine disaster that resulted in the death of 29 miners."[10]  <u>Id.</u>

---

[10] In his response, Mr. Blankenship passively asserts that this sentence amounts to a defamatory statement by implication inasmuch as it strongly suggests that his "conviction was related to the deaths of the 29 miners."  ECF 917 at 2.  First, the court notes that while Mr. Blankenship's complaint generally alleged that "many of the statements were made in conjunction with reference to the mine disaster and this, had the additional effect, through inference, implication, innuendo and/or insinuation, of further defaming [him] by falsely attributing to him responsibility for murder," he never specifically identified this statement or made this assertion in regard to ABC.  <u>See</u> ECF

The following morning, on July 24, 2021, a link to the article was posted from the ABC Politics Twitter account.  <u>See</u> ECF 888-5 ¶¶ 13-15.  In addition to a link to the article, the tweet also contained a slightly condensed version of the article's lead sentence: "Don Blankenship, the former coal baron and <u>convicted</u> <u>felon</u>, wades back into the state's U.S. Senate race, this time attempting to file paperwork to run as a member of the Constitution party."  <u>Id.</u> at ¶ 17 (emphasis added).  This same tweet was subsequently re-posted throughout the day on other ABC social media accounts, including the ABC News Politics and the This Week Facebook pages, the This Week Twitter account, and the ABC World News Tonight Twitter account.[11]  <u>See</u> <u>id.</u> ¶¶ 20-21.

Later that evening, Mr. Blankenship's campaign manager sent a screenshot of the ABC World News Tonight tweet via text message to Mr. Verhovek's former colleague, Meridith McGraw,[12]

_____

14 ¶¶ 23, 215.  Nonetheless, the court concludes that Mr. Blankenship has failed to demonstrate that this statement can be "reasonably read to impart the false innuendo" claimed. <u>Chapin v. Knight-Ridder, Inc.</u>, 993 F.2d 1087, 1092-93 (4th Cir. 1993). The statement correctly states the crime of conviction, which occurred following the 2010 Upper Big Branch Mine disaster wherein 29 miners lost their lives.

[11] The amended complaint only identifies the tweet posted by the ABC World News Tonight Twitter account.  <u>See</u> ECF 14 ¶ 215.

[12] Ms. McGraw was ABC's reporter normally assigned to cover the West Virginia Senate race.  <u>See</u> ECF 888-4 ¶ 10; ECF 888-6 ¶

asking "Can you help me get them to correct this tweet?"  ECF
888-48.  Ms. McGraw immediately emailed Mr. Verhovek to advise
him of the error, stating: "Just saw this tweet – Don
Blankenship is not a convicted felon.  He was found guilty of a
misdemeanor charge … It's confusing because he was sent to
federal prison for his misdemeanor charge.  We should correct
it!"  ECF 888-22; <u>see also</u> ECF 888-6 ¶ 14.

Less than twenty-four hours after publication, Mr.
Verhovek corrected the article to remove the "convicted felon"
reference and added the following note:

> *Correction: An earlier version of this story stated
> that Don Blankenship is a convicted felon, which he is
> not.  Blankenship was convicted of a misdemeanor
> charge for conspiring to violate federal mine safety
> laws.  He was acquitted of felony charges.  He served
> one year in federal prison.*

ECF 888-31; <u>see also</u> ECF 888-4 ¶ 45.  Approximately an hour
after the article was revised, all the Social Media posts had
likewise been corrected, with the hyperlinks to the article
accompanying these posts linking to the revised article.  <u>See</u>
ECF 888-5 ¶¶ 31-331; ECF 888-4 ¶ 49.  An internal memorandum
drafted by the social media editor was subsequently circulated
to inform others about Mr. Blankenship's conviction in efforts

---

4, 9.  Mr. Verhovek, however, was tasked with authoring the
article at issue in Ms. McGraw's absence.  <u>See</u> <u>id.</u>

to prevent the error from reoccurring.  See ECF 888-5 ¶ 35; ECF 888-44.

G.  Fox News, LLC

Fox News operates Fox News Channel and Fox Business Network, which are twenty-four-hour cable news television networks.  See ECF 14 ¶ 32.  Mr. Blankenship avers in April and May of 2018, Fox News broadcasted six defamatory statements concerning him made by six on-air broadcasters.[13]

On April 25, 2018, Andrew Napolitano, retired judge of the Superior Court of New Jersey and a Senior Judicial Analyst with Fox News, appeared on the Fox News Channel program Outnumbered.  See id. ¶ 16.  During the broadcast, Judge Napolitano interrupted the host to explain the nature of Mr. Blankenship's conviction:

> [HOST]: -- [Don Blankenship] has long been a very polarizing figure in West Virginia.  He went to jail actually after a really tragic coal mining --
>
> [JUDGE] NAPOLITANO -- he went to jail for manslaughter after people died.

ECF 890-8 at 10-11.  That evening, Judge Napolitano received an email from a Fox News editor stating that Mr. Blankenship's

---

[13] Mr. Blankenship named these broadcasters as individual defendants in his complaint.  In its March 31, 2021, memorandum opinion and order, the court dismissed these individual defendants on personal jurisdiction grounds.  See ECF 398.

campaign staff contacted him to inform Judge Napolitano that Mr. Blankenship was not convicted of manslaughter.  See ECF 953 at 7; ECF 953-8 at 7.[14]

The next day, on April 26, 2018, Judge Napolitano received an email from his producer informing him that Mr. Blankenship was convicted of a misdemeanor for conspiring to willfully violate mine safety laws and was acquitted of the felony charges.  ECF 890-19 at 2.  That same date, Mr. Napolitano responded to the Fox News editor's email he received the previous day:

> I understand now that yesterday I mistakenly misstated the nature of Mr. Blankenship's lamentable conviction and failed to mention his acquittals.  I will be happy to address this thoroughly and accurately [o]n air on Monday.  I feel very badly about this; especially since I am fond of him and wish him well in his Senate race.

---

[14] The court notes that Mr. Blankenship's response to Fox News' motion for summary judgment was due on June 7, 2021.  See ECF 444.  Mr. Blankenship timely filed his initial response on June 7, 2021.  See ECF 912.  On June 8, 2021, Mr. Blankenship filed an amended response.  See ECF 924.  Fox News timely replied on June 14, 2021.  See ECF 940.  On June 23, 2021, Mr. Blankenship, without explanation, filed a second amended response.  See ECF 953.  The second amended response appears to be identical to the first and contains the same number of exhibits.  The only difference appears to be that some portions of the exhibits attached to the second amended response are highlighted.  Fox News has not addressed the issue.  The court proceeds by viewing Mr. Blankenship's June 23, 2021, submission as his operative response brief.

ECF 890-20 at 2.  The Fox News editor then forwarded this response to Mr. Blankenship's campaign manager the same day. See id.

On the morning of the following Monday, April 30, 2018, the senior booking producer for the Fox News Channel program The Story with Martha MacCallum contacted Judge Napolitano's producer, inquiring whether Judge Napolitano had "pitches" for that evening's program.  ECF 890-21 at 10.  The producer further noted that the program's host, Martha MacCallum, planned on "cover[ing] the candidates" set to appear at the West Virginia Republican primary debate, which Ms. MacCallum later moderated.  Id.; see also ECF 953-9 at 10.  At Judge Napolitano's direction, his producer responded by pitching, among other things, that Judge Napolitano

> would love to explain the complex legal issues around
> Don Blankenship, one of the West Virginia senatorial
> candidates, who was unjustly prosecuted by the Obama
> DoJ over a coal mine disaster, and served time in
> federal prison.

ECF 890-21 at 9; see id. at 7.  The program's senior booking producer, however, was interested in a different pitch.  See id. at 7, 9.  Judge Napolitano's producer offered the same pitch to a producer for another program later the same morning, but he appears to have never received a definitive response.  See id. at 11-12.  Later that afternoon, Judge Napolitano's producer

contacted the executive producer for the program <u>Fox & Friends</u> asking for a "favor":

> The Judge asks if he could correct the record on WV
> senate candidate Don Blankenship's legal record.
> He was unfairly prosecuted[.]
> He was properly acquitted of his charges[.]
> He never should have gone to jail.
> (The Judge could either do it as a segment or just a
> throwaway at the end of a segment.)

<u>Id.</u> at 13; <u>see</u> ECF No. 953-8 at 13-14.  When the executive producer expressed interest in a different pitch, Judge Napolitano's producer replied, "[o]f course. . .  But could you throw him a bone about Blankenship at the very end?"  ECF 890-21 at 13.  The record contains no response to this request.

On May 22, 2018, after the Republican primary election, Judge Napolitano appeared on the Fox News Channel program <u>Your World with Neil Cavuto</u>, hosted by Neil Cavuto where he explained the error immediately following Mr. Cavuto's interview with Mr. Blankenship.  Mr. Napolitano explained:

> JUDGE NAPOLITANO: Let me say first that Don
> Blankenship is correct.  I once inadvertently said on
> air that he was a convicted felon.  He was not.  He
> was acquitted of the charges, the felony charges
> against him.  The only thing he was convicted of was a
> misdemeanor.  The definition of a misdemeanor is the
> maximum penalty is one year or less.  Definition [of]
> a felony is the maximum penalty is one year or more.
> He was convicted of the least of all the charges
> against him.

> MR. CAVUTO: So, just serving a year in jail
> doesn't make you a convicted felon?

JUDGE NAPOLITANO: That's correct.

ECF 890-14 at 7-8.

On May 6, 2018, Fox News Chairman and CEO, Rupert Murdoch, sent the following email to Fox News Executives Suzanne Scott and Jay Wallace:

> Both Trump and McConnell appealing for help to beat unelectable former mine owner who served time. Anything during day helpful but Sean and Laura dumping on him hard might save the day.

ECF 990-1.  The following day, Mr. Wallace responded to the email stating "After a tweet free weekend, [President Trump]'s back to tee up WV . . . ".  Id. at 9.  Mr. Wallace's response was accompanied by a direct quote of President Trump's tweet urging West Virginia voters to vote for "Rep. Jenkins or A.G. Morrisey" and not Mr. Blankenship.  Id.

Prior to the May 22, 2018, exchange between Mr. Cavuto and Judge Napolitano discussed above, on May 7, 2018, Mr. Cavuto made the following statement when discussing the West Virginia Republican senate primary election during a segment of his program Cavuto Coast to Coast:

> The president [is] warning Republicans, you know what, we're going to lose West Virginia if Don Blankenship is allowed to win the primary and he does win the primary.  Don Blankenship, of course, is arguing that he's the best qualified for this.  Of course, he's a convicted felon.

ECF 890-9 at 18 (emphasis added).  As previously mentioned, on May 22, 2018, after the election, Mr. Cavuto interviewed Mr. Blankenship on his program <u>Your World with Neil Cavuto</u>.  <u>See</u> ECF 1059-6 at 6-9.  The interview includes the following exchange:

> MR. BLANKENSHIP: [. . .]  And it's very disappointing that the news media and this network as well continues to tell people I'm a felon, which – I've never been convicted of a felony.  I'm probably less likely to be a felon than anyone, given that I was investigated for four and a half years and they couldn't find anything.
>
> MR. CAVUTO: So what are you if you've served time in jail?
>
> MR. BLANKENSHIP: A misdemeanor.  The only misdemeanor to serve time at a felon prison in California.  So I think that should tell us something as well when they're sending misdemeanors to prison so they can't continue to communicate for a year is – is pretty telling.

ECF 1059-6 at 9.

On May 7, 2018, John Layfield, a Fox News commentator, appeared on the Fox Business Network program <u>The Evening Edit</u> as a guest host.  <u>See</u> ECF 14 ¶ 168; ECF 890-16 ¶ 2.  During a discussion about the West Virginia Senate primary election, Mr. Layfield stated the following about Mr. Blankenship:

> Don Blankenship to those viewers who aren't aware . . . spent a year in prison because of a mine accident where he was accused and convicted of safety violations which 29 people were killed . . . but right now Blankenship is actually leading in the polls by some polls that have come out.  Thomas Massie, the congressman, says that it shows that Americans are just going to vote for the craziest SOB out there.  Is

> this Americans who are just voting for the craziest
> person out there?  Can this happen?  We got a <u>felon</u>
> who has got a probation officer who could end up in
> congress.

ECF 890-10 at 8 (emphasis added); <u>see also</u> ECF 890-16 at ¶ 3.

On May 7, 2018, Bradley Blakeman, a former staff member of President George W. Bush's administration, appeared as a guest on <u>The Evening Edit</u> program guest-hosted by Mr. Layfield discussed above.  <u>See</u> ECF 14 ¶ 79; ECF 890-10 at 5-6; ECF 890-15 ¶ 2.  In response to Mr. Layfield's comment that President Trump had recently urged West Virginia voters to "reject Don Blankenship," Mr. Blakeman responded:

> I think that's the right thing to do.  The president
> has to stand up for what's right.  We can't have the
> standard bearer of our party running for a statewide
> office and the guy's a <u>felon</u>.

ECF 890-10 at 7 (emphasis added); <u>see also</u> ECF 890-15 ¶ 3.

On May 8, 2018, Stephanie Hamill appeared on the Fox Business Program <u>Making Money</u>.[15]  <u>See</u> ECF 14 ¶ 167; ECF 890-17 ¶ 2.  When asked to comment on Mr. Blankenship's campaign Ms. Hamill stated:

> Now of course, [Mr. Blankenship's] record is a little
> bit sketchy and it might be difficult for him to

---

[15] Mr. Blankenship's complaint, Ms. Hamill's affidavit attached to Fox News' motion, and Fox News' briefing all state that the broadcast occurred on May 7, 2018.  ECF 14 ¶ 167; ECF 890-17 ¶ 2; ECF 891 at 7.  The court notes, however, that the transcript of the broadcast attached to Fox News' motion appears to demonstrate that the segment was aired within about an hour before the polls closed on May 8, 2018.  <u>See</u> ECF 890-11 at 15.

> actually win a general election because of his issue
> with being a <u>convicted</u> <u>felon</u> . . .  And, of course, he
> explains his story saying that it was big government
> [that] went after him and that this conviction was an
> indictment on the miners themselves.

ECF 890-11 at 15-16 (emphasis added).

On May 9, 2018, the day after the West Virginia primary election, Elizabeth MacDonald, host of the Fox News Business Network program <u>The Evening Edit</u>, discussed Mr. Blankenship's campaign. <u>See</u> ECF 14 ¶ 16; ECF 890-18 ¶ 2. During a portion of the segment, Ms. MacDonald quoted a story for her guest commentators that appeared in <u>The Washington Post</u>, which stated that "[j]ust because Blankenship lost does not mean he does not represent the Republicans." ECF 890-12 at 8. Thereafter, Ms. MacDonald commented "the implication here . . . is that a racist <u>felon</u> represents the Republican party." <u>Id.</u> at 8-9 (emphasis added); <u>see</u> <u>also</u> ECF 890-18 ¶ 3.

## H.  <u>Eli Lehrer</u>

Mr. Lehrer is the president of the R Street Institute, "a nonprofit, nonpartisan, public policy research organization [that he] co-founded." ECF 898-2; <u>see</u> ECF 950 at 13.  Mr. Lehrer, who has never been employed by The Charleston Gazette-Mail, wrote an op-ed as a "contributing columnist" that the Gazette-Mail published in its newspaper on May 25, 2018, some

two and a half weeks after the Republican primary election.  <u>See</u>
ECF 950-1 at 2.  The op-ed's lead sentence states:

> Former coal executive, <u>convicted</u> <u>felon</u> and self-
> described "Trumpier-than-Trump" West Virginia
> candidate Don Blankenship wants to remain in his U.S.
> Senate race after losing the Republican primary.

<u>Id.</u> (emphasis added).  The op-ed goes on to describe West
Virginia's so-called "sore-loser" law, which prohibits the name
of a candidate who lost in a party's primary election from
appearing on the general election ballot as an independent or as
another party's nominee for the same office.  <u>See id.</u>  Mr.
Lehrer contends in the op-ed that such laws should be repealed
and that Mr. Blankenship's name should be allowed to appear on
the ballot in the general election.  <u>See id.</u>

   Less than twenty-four-hours after publication, a
correction was issued in the Charleston Gazette-Mail's
newspaper, which stated:

> A column by Eli Lehrer on the Daily Mail opinion page
> in Friday's Gazette-Mail incorrectly characterized the
> criminal conviction of former Massey Energy head Don
> Blankenship.  He was convicted of a misdemeanor.

ECF 898-3 at 3; <u>see</u> ECF 898-2 ¶ 9.

I. <u>H.D. Media, LLC</u>

   HD Media is the publisher of the Charleston Gazette-
Mail newspaper, "the only daily . . . newspaper in Charleston,
West Virginia."  <u>See</u> ECF 14 ¶ 71.  In March 2018, HD Media began

24

publishing the newspaper after it purchased assets "of the
newspaper's former publisher in an auction that was part of a
bankruptcy proceeding in the Southern District of West
Virginia."  ECF 946 at 4; see also ECF 945-3 ¶ 2.  Like the
previous publisher, HD Media "published two physically and
editorially separate opinion pages in the Charleston Gazette-
Mail, one leaning left (the Gazette opinion page), and the other
leaning right (the Daily Mail opinion page)."  Id.

        The Daily Mail opinion page "was autonomous and had a
separate editor from the Gazette opinion page and the rest of
the newspaper."  Id.  Kelly Merritt was HD Media's editor of the
Daily Mail opinion page section at all times relevant herein.
Id.; see also ECF 945-3 ¶ 1.  Mr. Merritt was responsible for
the review and selection of content published on the Daily Mail
opinion page.  Id.

        Following the May 2018 primary election in West
Virginia, Mr. Merritt received an unsolicited opinion column
authored by Eli Lehrer, President of the R Street Institute in
Washington, DC, containing the alleged defamatory statement as
previously discussed. Id.; see also 945-3 at ¶ 3.  On May 25,
2018, after Mr. Merritt chose Mr. Lehrer's op-ed for
publication, it was published on the Daily Mail opinion page of
the Charleston Gazette-Mail newspaper.  Id.

On the morning Mr. Lehrer's op-ed was published, the mischaracterization of Mr. Blankenship's conviction was caught by the Gazette-Mail's executive editor who had not previously seen the opinion column.  See ECF 945-3 ¶ 10.  Corrections on the Gazette-Mail's website, as set forth above, and to the next day's print edition of the paper were promptly made.  See id. The Gazette-Mail's executive editor sent an email to Mr. Merritt and other individuals explaining the error and asked that the mistake not be made again.  See id. at 3-4.

## J.  Mediaite and Tamar Auber

Mediaite is a news and opinion website, which covers "politics and entertainment in the media industry."  ECF 14 ¶ 49.  Tamar Auber, a New York resident, worked as a writer for Mediaite at all times relevant herein.  ECF 900-1 ¶¶ 1,2.  On May 3, 2018, Mediaite published an article authored by Tamar Auber titled: "WV Senate Candidate Defends Horrifying Campaign Ad: 'There's No Mention of a Race' Like 'Negro.'"  See ECF 948-1.  The article discusses Mr. Blankenship's response to backlash received regarding his campaign advertisement aimed at Senator Mitch McConnell and his comments referring to Senator McConnell's wife's family as a "China Family" and Senator McConnell's father-in-law as a "Chinaperson."  Id.  The article goes on to state that "[t]he convicted felon turned Senate

hopeful then tried to defend the whole thing by claiming he was
an 'Americanperson' during the Fox News debate on Tuesday,
adding there are also 'Koreanpersons' and 'Africanpersons.'"
Id. (emphasis added); see also ECF 14 ¶ 164.

K.   Griffin Connolly and FiscalNote

FiscalNote is an "information services company" that
"connect[s] people and organizations to government."  See ECF
903-1 at 2.  It owns two news publications, including Roll Call,
a newspaper and website published and based in Washington, D.C.
See id.; see also ECF 14 ¶ 51; ECF 405 ¶ 51; ECF 947 at 6 n.1.
On May 7, 2018, the day before the Republican primary election,
Roll Call published an article titled "Blankenship Blames
Establishment for 'Misinforming' Trump."  ECF 903-4 at 2; see
also ECF 947 at 10 (denoting the article found at ECF 903-4 as
the article at issue).  The lead sentence of the article states:

> West Virginia GOP Senate candidate Don Blankenship
> suggested that establishment Republicans are
> "misinforming" President Donald Trump and telling him
> to oppose his campaign "because they do not want me to
> be in the U.S. Senate and promote the president's
> agenda," the convicted felon and businessman wrote
> Monday morning on Facebook.

ECF 903-4 at 3 (emphasis added).  The remainder of the article
discusses comments made by Mr. Blankenship during his campaign,
as well as President Trump's efforts to back Mr. Blankenship's
Republican opponents in the primary election.  See id. at 3-5.

The penultimate sentence of the article states that Mr. Blankenship "was convicted of conspiracy to violate federal mine safety laws after 29 miners were killed in the 2010 Upper Big Branch Mine disaster."  Id. at 5.

The article indicates that it was "[p]osted" by Eric Garcia, a staff writer for Roll Call, and that Griffin Connolly, another staff writer, "contributed to th[e] report."  Id. at 2, 5; see also ECF 903-3 ¶¶ 2, 6; ECF 14 ¶ 101; ECF 405 ¶ 101.  In an affidavit, Mr. Garcia states that he authored the article and that, despite the article's indication to the contrary, Mr. Connolly was not involved in writing or publishing the article.  See ECF 903-3 ¶¶ 3, 6; see also ECF 903-5 ¶ 3.

Although the amended complaint alleges that Mr. Connolly authored the article and thus names him as a defendant, see ECF 14 ¶ 175, Mr. Blankenship, in his summary judgment briefing, does not appear to dispute that Mr. Connolly was not involved in the article's publication.  See ECF 947 at 6. Instead, he appears to concede that the article was authored by Mr. Garcia and focuses solely on Mr. Garcia's state of mind in assessing the actual malice element of his defamation claim. See id. at 6, 9-11.  Inasmuch as Mr. Blankenship does not contest the assertion that Mr. Connolly should be awarded summary judgment on the ground that he was not involved in

publishing the article at issue, the court concludes that Mr. Connolly is entitled to summary judgment on this basis.

L.   <u>Causes of Action</u>

Mr. Blankenship's complaint asserts four claims, though, somewhat confusingly, lists them in two counts.  <u>See</u> ECF 14 ¶¶ 222-50.  In all, Mr. Blankenship asserts claims for (1) defamation, (2) conspiracy to defame, (3) false light invasion of privacy, and (4) conspiracy to commit false light invasion of privacy.  <u>See</u> <u>id.</u>

While the complaint's headings suggest that Mr. Blankenship brings all four claims against all named defendants, a closer reading demonstrates that the conspiracy claims are asserted against a subset of the named defendants.  These defendants include the following, all of whom are now dismissed: 35th Inc. ("35th PAC"[16]), the National Republican Senatorial Committee (the "NRSC"), and Kevin McLaughlin, as well as unidentified "'Conspiracy Does'",[17] whom, together, the complaint

---

[16] Although the caption of the amended complaint identifies this defendant as "35th Inc.," it is later referred to throughout the body of the complaint as "35th PAC."  <u>See</u> ECF 14 at 1, 15, 35, 55.  By separate memorandum opinion and order, entered this same date, the court granted 35th PAC's motion for summary judgment in its entirety.

[17] By separate order entered this same date, the court has dismissed the claims against the unidentified Doe defendants,

dubs the "'Conspiracy Defendants.'"[18]  Id. ¶¶ 233-36, 246-49.  As
to one other defendant, Fox News, the parties dispute whether
the complaint adequately asserts the conspiracy claims against
it.  Although the complaint fails to include Fox News in its
reference to the "Conspiracy Defendants", the court concludes --
in an abundance of caution -- that the complaint sets forth the
slimmest of factual allegations sufficiently alleging its
involvement in the conspiracy.  Indeed, the complaint alleges
the following regarding Fox News' alleged participation in the
civil conspiracies:

> [Senate Majority Leader Mitch] McConnell, set in
> motion the wheels of a clandestine campaign —
> including a 'menu of items' — to destroy Mr.
> Blankenship and blatantly interfere in a federal
> election, using among other things, the [NRSC], and
> his contacts in the establishment media, including Fox

---

including those whom the complaint designates as the Conspiracy
Does.

[18] The claims against the NRSC and Mr. McLaughlin have been
dismissed.  See ECF 694; ECF 398 at 52, 78.  Following the
court's dismissal of Mr. McLaughlin on personal jurisdiction
grounds, Mr. Blankenship instituted a nearly identical action
against him in the Eastern District of Virginia. See Blankenship
v. McLaughlin, No. 1:20-cv-00429-LMB-IDD (E.D. Va.), ECF 91. On
November 13, 2020, Mr. McLaughlin notified Mr. Blankenship of
his intent to seek Fed. R. Civ. P. 11 sanctions against him on
the ground that Mr. Blankenship's interrogatory responses
demonstrated he had no factual basis for pursuing his claims
against Mr. McLaughlin, unless Mr. Blankenship agreed to dismiss
his claims.  See ECF 802-1 (sealed).  On December 11, 2020, Mr.
Blankenship and Mr. McLaughlin stipulated to dismissal of the
claims against Mr. McLaughlin with prejudice.  See McLaughlin,
ECF No. 91.

> **News in particular**, to do McConnell's (and in turn,
> the NRSC's) bidding.

ECF 14 ¶ 4 (emphasis added).  The complaint goes on to allege
that "multiple news personalities, lubricated by their disdain
for Mr. Blankenship, and <u>some at the direction of McConnell</u> and
other GOP leaders, falsely called Mr. Blankenship a 'felon' and
'convicted felon'" and that <u>"[t]hese statements were made on Fox
News</u> and in other venues by conservative commentators."  <u>Id.</u> ¶
21 (emphasis added).  Reading these two paragraphs together, it
appears Mr. Blankenship has sufficiently alleged that, at the
direction of Senator McConnell, Fox News participated in a
"clandestine campaign" to defame and place Mr. Blankenship in a
false light by falsely referring to him as a "felon" and
"convicted felon" on air by its conservative commentators.

Moreover, throughout this litigation, Mr. Blankenship
and Fox News have engaged in numerous discovery disputes
regarding the relevance of certain document production requests
as related to Mr. Blankenship's conspiracy claims.  <u>See</u> ECF Nos.
589, 919, 974, 985.  The fact that the conspiracy claims, and
the discovery related thereto, have been at issue throughout
this case demonstrates that Fox News has been on notice of the
conspiracy claims and Mr. Blankenship's persistence in pursuing
the same.  Further, the parties have adequately addressed the

31

conspiracy claims in their respective summary judgment briefings.

While Mr. Blankenship could have and should have taken greater care in his complaint to assert the conspiracy claims against Fox News more clearly, the court finds that these factual allegations are sufficient to provide Fox News fair notice of the conspiracy claims and the grounds upon which they rest.  See Wright v. North Carolina, 787 F.3d 256, 263 (4th Cir. 2015) (noting "while the complaint 'must contain sufficient facts to state a claim that is plausible on its face,' it nevertheless 'need only given the defendant fair notice of what the claim is and the grounds upon which it rests.'") (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)).  Accordingly, the court concludes that the conspiracy claims are properly asserted against Fox News.

## II.  Governing Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v.

_Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  _Id._  In deciding a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party.  _See_ _Tolan v. Cotton_, 572 U.S. 650, 651, 657 (2014) (per curiam).

### III.   Defamation

Defamation is "[a] false written or oral statement that damages another's reputation."  _Pritt v. Republican Nat. Comm._, 557 S.E.2d 853, n.12 (W. Va. 2001) (quoting Black's Law Dictionary 427 (7th ed. 1999)).[19]

West Virginia law identifies three types of plaintiffs in defamation cases: (1) public officials and candidates for public office, (2) public figures, and (3) private individuals.  _See_ Syl. Pt. 10, _Hinerman v. Daily Gazette Co._, 423 S.E.2d 560, 564 (W. Va. 1992); _see_ _generally_ _Wilson v. Daily Gazette Co._, 588 S.E.2d 197 (W. Va. 2003) (discussing types of public figures in defamation suits).  The first step in assessing a claim for

---

[19] None of the parties dispute that West Virginia law governs this action.  _See_, _e.g._, ECF 891 at 11 n.1.

defamation is to determine whether the plaintiff is a private individual or is instead a candidate for public office, a public official, or a public figure.  See Zsigray v. Langman, 842 S.E.2d 716, 722 (W. Va. 2020).  Mr. Blankenship does not dispute that he qualifies as both a candidate for public office and a public figure in this action.[20]  See, e.g., ECF 953 at 14.  While some of the alleged defamatory statements at issue came after the conclusion of the primary election -- the last of such statements being from the Washington Post on August 9, 2018 -- the court finds that Mr. Blankenship qualified as a candidate for public office through that time given his intention to run as the Constitution Party's candidate for the United States Senate.[21]

---

[20] Based on the allegations in the complaint, the court previously determined that Mr. Blankenship qualifies as a candidate for public office and "may also qualify as a public figure in West Virginia based on his 'prominence and notoriety'".  See ECF 398 at 17 (citing State ex rel. Suriano v. Gaughan, 480 S.E.2d 548, 556 (W. Va. 1996)).

[21] The Supreme Court of Appeals of West Virginia did not reject Mr. Blankenship's attempt to run as the Constitution Party's candidate until August 29, 2018.  See State ex rel. Blankenship v. Warner, 825 S.E.2d 309, 312 n.1 (W. Va. 2018). The court later issued its written opinion detailing its decision on October 5, 2018. Id.

As Mr. Blankenship concedes, his notoriety in the state of West Virginia, his pervasive involvement in the national political arena, and the extensive national media attention he has received as set forth in detail above make clear that he also qualifies as a public figure.  See Wilson, 588 S.E.2d at 205 (explaining that an individual's "general fame or notoriety in the state and pervasive involvement in the affairs of society" renders that individual an "all-purpose public figure" in a defamation action.).  Regardless of whether Mr. Blankenship is referred to as a candidate for public office or public figure, the First Amendment protections are the same for each.  See Gertz v. Robert Welch, Inc., 418 U.S. 323, 336 (1974) (noting the test set forth in New York Times v. Sullivan applies to both "criticism of 'public figures' as well as 'public officials.'"); see also Monitor Patriot Co. v. Roy, 401 U.S. 265, 271 (1971) (noting that it "might be preferable to categorize a candidate for [public office] as a 'public figure,'" as opposed to a public official, "if for no other reason than to avoid straining the common meaning of words. But . . . it is abundantly clear that, whichever term is applied, publications concerning candidates [for public office] must be accorded at least as much protection under the First and Fourteenth Amendments as those concerning occupants of public office.").

To recover in a defamation action, a plaintiff who qualifies as a candidate for public office must prove that:

> (1) there was the publication of a defamatory statement of fact or a statement in the form of an opinion that implied the allegation of undisclosed defamatory facts as the basis for the opinion; (2) the stated or implied facts were false; and, (3) the person who uttered the defamatory statement either knew the statement was false or knew that he was publishing the statement in reckless disregard of whether the statement was false.

Syl. Pt. 5, Chafin v. Gibson, 578 S.E.2d 361, 363 (W. Va. 2003) (per curiam) (emphasis omitted) (quoting Syl. Pt. 1, Hinerman, 423 S.E.2d at 563); accord Syl. Pt. 7, Pritt, 557 S.E.2d at 855; see also State ex rel. Suriano, 480 S.E.2d at 561 (setting forth nearly identical elements in a defamation action involving a limited purpose public figure).  Further, the Supreme Court of Appeals of West Virginia has held that, to sustain a defamation action, a plaintiff who qualifies as a candidate for public office must also prove that "the publisher intended to injure the plaintiff through the knowing or reckless publication of the alleged libelous material."  Syl. Pt. 4, Chafin, 578 S.E.2d at 363 (quoting Syl. Pt. 1, Sprouse v. Clay Commc'n Inc., 211 S.E.2d 674, 679 (1975)); accord Syl. Pt. 6, Pritt, 557 S.E.2d at 855; see also State ex rel. Suriano, 480 S.E.2d at 561 (noting a limited purpose public figure must also prove a publisher's intent to injure).  A plaintiff who qualifies as a candidate for

public office must prove each of the elements of his claim by clear and convincing evidence.  See Chafin, 578 S.E.2d at 366-67; Pritt, 557 S.E.2d at 862; Hinerman, 423 S.E.2d at 572-73.

The defendants contend that Mr. Blankenship's defamation claims fail inasmuch as Mr. Blankenship has failed to produce clear and convincing evidence demonstrating: (1) actual malice (2) material falsity of the alleged defamatory statements; and (3) an intent to injure.[22]

## A.  Defamatory Statement

"A court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning."  Syl. Pt. 8, Pritt, 557 S.E.2d at 855 (quoting Syl. Pt. 4, Long v. Egnor, 346 S.E.2d 778 (W. Va. 1986)).  In making this determination, the court "must also consider whether the allegedly defamatory statements could be construed as statements of opinion" inasmuch as an opinion "which does not contain a provably false assertion of fact is entitled to full constitutional protection."  Id. at 861 (internal citations omitted).  A statement may be described as

---

[22] A majority of the defendants further contend that the defamation claims fail inasmuch as Mr. Blankenship is unable to demonstrate that he suffered damages attributable to the alleged defamatory statements.  See, e.g., ECF 885 at 23; ECF 887 at 24; ECF 889 at 25; ECF 891 at 26; ECF 899 at 16; ECF 904 at 11; ECF 946 at 18.

defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, 77 (W. Va. 1983) (citing Restatement (Second) of Torts § 559 (1977)).

Under West Virginia law, statements falsely charging an individual with the commission of any crime, whether a felony or misdemeanor, are actionable as defamation per se. See Milan v. Long, 88 S.E. 618, 619 (W. Va. 1916); see also Mauck v. City of Martinsburg, 280 S.E.2d 216, 219 n.3 (W. Va. 1981) ("At common law, defamation per se includes . . . imputations of a crime of moral turpitude"); Colorado v. Gazette Pub. Co., 145 S.E. 751, 753 (W. Va. 1928) ("Any printed or written publication imputing to another a crime or moral delinquency is actionable per se, without proof of special damages."); Pritt, 557 S.E.2d at 857 n.4 (recognizing defamation per se means "[a] statement that is defamatory in and of itself and is not capable of an innocent meaning.") (quoting Black's Law Dictionary 427 (7th ed. 1999)).

In its March 31, 2020, memorandum opinion and order, the court concluded that the challenged statements are capable of defamatory meaning "because they reflect shame and disgrace" upon Mr. Blankenship. Blankenship v. Napolitano, 451 F. Supp.

596, 617 (2020); see also ECF 398 at 18-20.  The court further
concluded that the statements "may also be considered defamatory
per se because they impute a felony conviction."  Id.  To the
extent any of the statements could be considered opinions, the
court concluded "they are based on a 'provably false assertion
of fact' and thus are not absolutely protected under the First
Amendment."  Id.  The court incorporates these previous
findings herein and concludes that the challenged statements are
not only capable of defamatory meaning but constitute defamation
per se as a matter of law.[23]  The first element of Mr.
Blankenship's defamation claims is thus satisfied.

B.  Actual Malice

        To satisfy the essential elements of a defamation
cause of action, a plaintiff who qualifies as a candidate for
public office must prove "actual malice" on the part of the
publisher; that is, that the publisher made the defamatory

---

        [23] The court recognizes that Mr. Blankenship was convicted
of a misdemeanor offense, which amounts to a criminal
conviction.  Nonetheless, inasmuch as "a felony conviction
carries significantly greater legal consequences than a
misdemeanor does," the court concludes the per se rule is
applicable.  Myers v. The Telegraph, 332 Ill.App.3d 917, 773
N.E.2d 192, 197 (2002) (concluding the defamation per se rule
should still apply given the "little, if any, practical
difference between falsely accusing a person of committing a
crime and falsely attributing a felony conviction to a person
who pleaded guilty only to a misdemeanor.")

statement "'with knowledge that the statement was false or with reckless disregard of whether it was false or not.'" Chafin, 578 S.E.2d at 366 (brackets omitted) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).

The actual malice standard derives from the United States Supreme Court's decision in Sullivan and its progeny, which, as recognized by the Supreme Court of Appeals of West Virginia, "placed a [F]irst [A]mendment, free speech gloss upon all prior law of defamation." Havalunch, Inc. v. Mazza, 294 S.E.2d 70, 73 (W. Va. 1983); see id. (noting that First Amendment concerns and concomitant protections provided by the actual malice standard, are at their "strongest" when the statement at issue concerns "a public official or candidate for office because of the need for full, robust, and unfettered public discussion of persons holding or aspiring to offices of public trust."). Thus, "'application of the state law of defamation' is limited . . . by the First Amendment," CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 293 (4th Cir. 2008) (quoting Milkovich v. Loarin Journal Co., 497 U.S. 1, 14 (1990)), and the court applies federal law in assessing the

element of actual malice, see Berisha v. Lawson, 973 F.3d 1304, 1314 n.6 (11th Cir. 2020).[24]

"'Actual malice is a subjective standard.'" Fairfax v. CBS Corp., 2 F.4th 286, 293 (4th Cir. 2021) (alteration omitted) (quoting Reuber v. Food Chem. News, Inc., 925 F.2d 703, 714 (4th Cir. 1991) (en banc)). Thus, "[t]he actual malice standard requires that 'the defendant had a particular, subjective state of mind at the time the statements were made.'" Id. at 295 (quoting Horne v. WTVR, LLC, 893 F.3d 201, 211 (4th Cir. 2018)). Accordingly, "[a] plaintiff must prove that the defendant published the statement despite actually knowing it was false or harboring 'a high degree of awareness of probable

---

[24] Mr. Blankenship notes that he believes that the court "is not, and should not be[,] bound by the limits of New York Times Co. v. Sullivan in the present circumstances." ECF 905 at 10 n.4; ECF 948 at 6 n.3; ECF 965 at 9 n.5. In support, he cites to a self-signed statement that he attached to his response brief regarding defendant Fox News' motion for summary judgment, wherein he generally asserts that the heightened standards imposed by Sullivan and its progeny on all plaintiffs who qualify as public figures is not in keeping with the First Amendment's free-speech protections. See ECF 953-20. It is unclear whether this statement, which is tantamount to a pro se legal brief signed by a represented party, is properly submitted. See, e.g., McCulloch v. Velez, 364 F.3d 1, 5 (1st Cir. 2004) (discussing hybrid representation). Regardless, although Sullivan has been subject to recent criticism and calls for reconsideration, see Berisha v. Lawson, 141 S. Ct. 2424, 2424 (2021) (Thomas, J., dissenting from denial of certiorari); id. at 2425 (Gorsuch, J., dissenting from denial of certiorari); Tah v. Global Witness Publ'g, Inc., 991 F.3d 231, 243 (D.C. Cir. 2021) (Silberman, J., dissenting in part), it remains binding precedent that the court is obliged to follow.

falsity.'"   Id. at 293 (ellipsis omitted) (quoting Reuber, 925 F.2d at 714).   To show reckless disregard for the truth, then, "a plaintiff must prove that 'the defendant in fact entertained serious doubts as to the truth of his publication.'"   Id. (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).

A plaintiff who is a candidate for public office bears the heavy burden of proving actual malice by clear and convincing evidence.   See CACI, 536 F.3d at 293 (citing Carr v. Forbes, Inc., 259 F.3d 273, 282 (4th Cir. 2001)); see also Carr, 259 F.3d at 282 (4th Cir. 2001) ("Establishing actual malice is no easy task . . . .").   At the summary judgment stage, the appropriate inquiry for the court is "whether the evidence in the record could support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear and convincing evidence."   Anderson, 477 U.S. at 255-56; see Harte-Hanks Commc'ns v. Connaughton, 491 U.S. 657, 685 (1989) ("The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.").

As a threshold matter, Mr. Blankenship contends that "the issue of 'actual malice' is rarely appropriate for summary judgment because it involves determinations with respect to the defendant[s'] state of mind."   See, e.g., ECF 905 at 11-12.   He

further asserts it is inappropriate for the court to address actual malice at this stage inasmuch as the existence of the same hinges on the credibility of the authors, which is a subjective evaluation for the jury.  See id.  In support of this contention, Mr. Blankenship cites dicta from a footnote of the Supreme Court's decision in Hutchison v. Proxmire, 443 U.S. 111 (1979), for the proposition that the issue of actual malice "does not readily lend itself to summary disposition" because it "calls a defendant's state of mind into question."  443 U.S. at 120 n.9.  He goes on to cite numerous cases in which courts have denied summary judgment in defamation actions where genuine issues of material fact existed as to whether the defendant acted with actual malice.  See, e.g., ECF 905 at 11-12.

Mr. Blankenship's contention is unavailing when squared with the controlling precedent on this issue.  In Anderson, the Supreme Court held that

> the determination of whether a given factual dispute
> requires submission to a jury must be guided by the
> substantive evidentiary standards that apply to the
> case. . . . .  [W]here the factual dispute concerns
> actual malice . . . the appropriate summary judgment
> question will be whether the evidence in the record
> could support a reasonable jury finding either that
> the plaintiff has shown actual malice by clear and
> convincing evidence or that the plaintiff has not.

477 U.S. at 255-56.  The standard articulated in Anderson clearly contemplates that summary judgment is an appropriate

procedure for addressing actual malice.  Indeed, the Court in
Anderson expressly rejected the argument that a defendant in a
public figure defamation action "should seldom if ever be
granted summary judgment where his state of mind is at issue and
the jury might disbelieve him or his witnesses as to this
issue."  Id. at 256.[25]  Instead, the Court explained, if the
defendant shows there is no genuine factual dispute as to actual
malice, "the plaintiff is not . . . relieved of his own burden
of producing in turn evidence that would support a jury
verdict."  Id.  Thus, "the plaintiff must present affirmative
evidence in order to defeat a properly supported motion for
summary judgment," and "[t]his is true even where the evidence
is likely to be within the possession of the defendant, as long
as the plaintiff has had a full opportunity to conduct
discovery."  Id. at 257.

     The upshot of Anderson, then, is that the summary
judgment procedure is not foreclosed simply because the actual
malice inquiry involves evidence pertaining to a defendant's

---

[25] The Court in Anderson explained that the Court's
"statement in Hutchinson . . . that proof of actual malice 'does
not readily lend itself to summary disposition' was simply an
acknowledgment of [the Court's] general reluctance to grant
special procedural protections to defendants in libel and
defamation actions in addition to the constitutional protections
embodied in the substantive laws."  447 U.S. at 256 n.7
(internal citations and quotation marks omitted).

state of mind and that summary disposition on the actual malice

issue is neither favored nor disfavored.  As a descriptive

matter, however, given the heightened showing required of public

figure plaintiffs, "[s]ummary judgment for the publisher is

quite often appropriate," not necessarily because it is

favored,[26] but "because of the difficulty a public [figure] has

in showing 'actual malice.'"  St. Surin v. Virgin Islands Daily

News, Inc., 21 F.3d 1309, 1318 (3d Cir. 1994); see also CACI,

536 F.3d at 293 (explaining that "establishing actual malice is

no easy task" at the summary judgment stage (brackets and

quotation marks omitted)).  Accordingly, the court rejects Mr.

Blankenship's contention that the issue of actual malice should

not be considered at this stage.

---

[26] But see Kahl v. Bureau of Nat'l Affairs, Inc., 856 F.3d 106, 108 (D.C. Cir. 2017) (Kavanaugh, J.) ("To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits."); id. at 116 ("Summary proceedings 'are essential in the First Amendment area because if a suit entails long and expensive litigation, then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails.'" (quoting Farrah v. Esquire Mag., 736 F.3d 528, 534 (D.C. Cir. 2013))). The decision in Kahl comes at the summary judgment stage, wherein the appellate court reversed the district court's decision denying the defendant's motion for summary judgment given the lack of evidence that the defendant acted with actual malice.  Id. at 118.

1. **N&G, Eli Lehrer, Mediaite, Tamar Auber, FiscalNote, and HD Media**

These six defendants first contend that Mr. Blankenship is unable to produce evidence that the authors of the articles -- or those responsible for their publication -- knew that the references to Mr. Blankenship as a felon were false or were made in reckless disregard for the truth at the time of publication.  The defendants rely on various affidavits submitted by the article's authors or publishers in support of this assertion.

For instance, N&G relies on the affidavit of its former executive producer, Wayne Nelson, wherein he avers he was involved in the editorial process and publication of N&G's May 7, 2018, article and that he was unaware that Mr. Blankenship was convicted of a misdemeanor offense at the time of publication.  See ECF 880-1 ¶¶ 2, 4-5.  FiscalNote points to Mr. Garcia's affidavit, wherein he states that he authored the article at issue and, at the time of publication, was unaware that Mr. Blankenship had been convicted of a misdemeanor rather than a felony nor did he doubt that the felony reference was accurate.  See ECF 903-3 ¶¶ 3, 5.  Mr. Lehrer and Ms. Auber likewise state in their affidavits that at the time their articles were published, they were unaware that Mr. Blankenship

had been convicted of a misdemeanor and did not doubt the accuracy of their references to him as a felon. <u>See</u> ECF 898-2 ¶ 5; ECF 900-1 ¶¶ 4, 7.

HD Media relies on Mr. Merritt's affidavit, the individual responsible for the Gazette-Mail's publication of Mr. Lehrer's op-ed. [27] Mr. Merritt avers he received the unsolicited op-ed via email and, being aware of the R Street Institute and the publication of other opinion columns authored by Mr. Lehrer, he had no reason to question the accuracy of the content they authored. <u>See</u> ECF 945-5 ¶¶ 3, 5. Mr. Merritt further states he did not realize or believe the op-ed's characterization of Mr.

---

[27] The court notes that "the state of mind required for actual malice [has] to be brought home to the persons in the [defendant's] organization having responsibility for the publication[.]" <u>Sullivan</u>, 376 U.S. at 287-88. Based on the evidence presented, Mr. Merritt was the sole individual at HD Media responsible for the op-ed's publication. <u>See</u> ECF 945-3, ¶ 4. In his response brief, Mr. Blankenship appears to contend that in addition to Mr. Merritt, other "staff members" of HD Media bear responsibility for the publication of the alleged defamatory statement. Mr. Blankenship asserts that "the persons having responsibility for calling [him] a 'convicted felon' include [HD Media], Charleston Gazette-Mail, and their staff members, including but not limited to, Kelly [Merritt], [Eli] Lehrer (the author of the Statement), as well as any others involved in writing, editing, and/or publication of the Statement." ECF 965 at 6. Mr. Blankenship, however, has provided no evidence identifying these other "staff members." Further, the court notes that the record evidence demonstrates that Mr. Lehrer, the op-ed's author, was never an employee of HD Media nor did he or the R Street Institute receive compensation for the op-ed. <u>See</u> ECF 945-3 ¶ 7.

Blankenship's conviction as a felon was inaccurate or false at the time of publication.  See id. ¶ 6.  These six defendants contend that Mr. Blankenship has produced no evidence to contradict these affidavits.

These six defendants further assert that the authors' beliefs that Mr. Blankenship was a felon were reasonable under the circumstances.  FiscalNote references Mr. Garcia's affidavit, which states that when drafting the article, he relied on numerous other news publications that referred to Mr. Blankenship as a felon.[28]  See ECF 904 at 9, 15 (citing ECF 903-3 ¶ 4).  Mr. Lehrer likewise avers that he relied on numerous media reports that Mr. Blankenship was a felon when he drafted his article.  See ECF 899 at 5-11, 15 (citing ECF 898-2 ¶ 5).  Specifically, Mr. Lehrer notes fifty-six instances, as identified in Mr. Blankenship's own complaint, of media reports referring to Mr. Blankenship as a felon prior to the publication of Mr. Lehrer's May 25, 2018, article.  See ECF 899 at 7-10.  The defendants also contend that the reasonableness of the authors' beliefs that Mr. Blankenship was a felon is further supported by the serious nature of his crime and the one-year

---

[28] In his briefing, Mr. Blankenship does not dispute that numerous news publications referred to him as a felon prior to the publication of Mr. Garcia's May 7, 2018, article.

prison sentence imposed upon him.  See ECF 881 at 5-6; ECF 899 at 14; ECF 904 at 14-15; ECF 946 at 13-14.

Mr. Blankenship responds that the authors' violations of professional standards and their failure to investigate the nature of his conviction demonstrate actual malice.  Regarding the N&G article and the Mediaite article written by Tamar Auber, Mr. Blankenship asserts that the articles' animus towards him also demonstrates actual malice.  The court will address each contention in turn.

First, with respect to N&G, FiscalNote, Mediaite and HD Media, Mr. Blankenship contends that the lack of internal policies regarding verifying publications and reporting on criminal charges amounts to actual malice.  See, e.g., ECF 905 at 6, 14; ECF 947 at 14; ECF 948 at 14-16; ECF 965 at 14. Specifically, Mr. Blankenship asserts the failure to maintain such policies is a departure from accepted journalistic standards.  As to FiscalNote, Mr. Blankenship points to the "Mission" on Roll Call's website, which states that it has "earned a reputation for delivering comprehensive, accurate, and objective congressional reporting."  ECF 947 at 14 (emphasis omitted) (citing https://www.rollcall.com/about).[29]  He contends

---

[29] Mr. Blankenship provides no citation to the record for this quotation from Roll Call's website but merely cites the

that the FiscalNote article authored by Mr. Garcia referencing him as a felon constitutes a violation of this standard and a finding of actual malice.

With respect to Mr. Lehrer, Mr. Blankenship contends that his position as the president of a research institute subjects him to a higher standard in conducting research.  Mr. Blankenship further asserts that Mr. Lehrer's failure to locate and use publications that correctly identified him as a misdemeanant demonstrates "an injudicious research methodology," amounting to "an extreme departure from professional publication standards."  ECF 950 at 13-15.

Mr. Blankenship, however, has failed to identify any putative journalistic, research, or other professional standard, nor has he attempted to substantiate the existence or contours of any such standard with record evidence.[30]  At this stage, Mr. Blankenship is obligated to produce affirmative evidence of actual malice.  Bare assertions, with no citation to the record,

website URL address.  While there is reason to question whether this evidence is properly submitted, the court will assume for purposes of this memorandum opinion and order that it may be considered.

[30] The closest Mr. Blankenship comes to identifying any standard is his citation to the Roll Call website's mission statement.  On its face, however, the portion of the statement relied upon is Roll Call's description of its own reputation, not a journalistic standard for its authors to follow.

that these defendants violated unspecified standards is insufficient to create a genuine dispute of material fact.  <u>See</u> <u>Nunes v. WP Co., LLC</u>, 513 F. Supp. 3d 1, 8 (D.D.C. 2020) (rejecting the contention that the complaint sufficiently alleged actual malice by alleging the defendant violated journalistic standards in part because the "[p]laintiff nowhere identifies the journalistic standards . . . the [defendant] purportedly violated" (quotation marks omitted)).

Even assuming that Mr. Blankenship were able to identify some specific journalistic standard that was allegedly violated, this contention alone would be insufficient to establish a showing of actual malice.  Indeed, as the Supreme Court has made clear, "a public figure plaintiff must prove more than an extreme departure from professional standards" to demonstrate actual malice by clear and convincing evidence. <u>Harte-Hanks</u>, 491 U.S. at 665; <u>see also</u> Reuber, 925 F.2d at 711-12 (noting that "the Harte-Hanks Court went to some lengths to reaffirm that a departure from accepted standards alone does not constitute actual malice."); <u>Hinerman</u>, 423 S.E.2d at 573 (noting that "egregious deviation from accepted standards of journalism <u>standing</u> <u>alone</u> will not carry the day for a public official libel plaintiff . . . .") (emphasis in original)).

Second, Mr. Blankenship asserts the public availability of his misdemeanor conviction at the time the articles were published supports a finding of actual malice.[31] Simply put, Mr. Blankenship contends the authors failed to adequately investigate the nature of his conviction before publishing.  This contention, however, fares no better than the first.  Importantly, "recklessness 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.'"  Fairfax, 2 F.4th at 293 (quoting St. Amant, 390 U.S. at 731).  Thus, a publisher's "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." Harte-Hanks, 491 U.S. at 688, 692.  Accordingly, the authors' mere failure to consult public records regarding Mr. Blankenship's conviction alone cannot establish actual malice by clear and convincing evidence given that a "failure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard

---

[31]  Mr. Blankenship contends that public records available through a Google search, his own comments regarding his conviction during the nationally televised Republican primary debate, and other news sources that correctly reported his misdemeanor conviction would have apprised the authors that he was convicted of a misdemeanor offense.  See, e.g., ECF 905 at 12; ECF 947 at 10-11; ECF 950 at 9-10.

for the truth." **Pippen v. NBCUnivsersal Media**, LLC, 734 F.3d 610, 614 (7th Cir. 2013).

Nonetheless, "failure to investigate before reporting a third party's allegations can be reckless 'where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" **Fairfax**, 2.4th at 293 (quoting **Harte-Hanks**, 491 U.S. at 688). Indeed, [a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." **Harte-Hanks**, 491 U.S. at 692. As to HD Media, for example, Mr. Blankenship contends the fact that the Charleston-Gazette had accurately reported numerous times that he was convicted of a misdemeanor prior to publishing Mr. Lehrer's article is evidence of its purposeful avoidance of the truth.[32] The record, however, is devoid of any evidence that Mr. Merritt

---

[32] In support of this assertion, Mr. Blankenship cites to the following publications by the Charleston Gazette-Mail, which accurately reported his conviction as a misdemeanor: (1) a December 3, 2015, excerpt from a brief publication titled "Blankenship Guilty of One Count, Not Guilty on Two Other" found on the website's "Blankenship Trial Timeline" page; (2) two articles HD Media admitted in its interrogatories to publishing on April 18, 2018 and May 22, 2018 (See ECF 965-1 at ¶ 5); and (3) a May 7, 2018, blog post on the Charleston Gazette-Mail's "Coal Tattoo" blog authored by Ken Ward Jr., titled "The politics of why Don Blankenship isn't a felon."  Mr. Blankenship has not attached copies of these articles to his response brief but instead merely cites to the URL addresses where the December 3, 2015, and May 7, 2018, publications can be found.

-- the individual responsible for HD Media's publication of Mr. Lehrer's article -- knew of the existence of these accurate reports at the time he published the article.

As the court previously explained in its opinion in Blankenship v. Napolitano, "the 'mere presence' of previous stories in a [media organization's] files does not establish that the [media organization] knew that the statement was false 'since the state of mind required for actual malice would have to be brought home to the persons in the . . . organization having responsibility for the publication of the [statement].'" 451 F. Supp. 3d 596, 619 (quoting Sullivan, 376 U.S. at 287). Absent evidence that Mr. Merritt was aware of the prior publications, the mere existence of the same in HD Media's files is of little moment respecting the actual malice inquiry.

In sum, there is no evidence in the record from which a reasonable jury could find that the authors or publishers of these articles had any doubt as to the accuracy of their publications or as to the news sources they relied upon in characterizing Mr. Blankenship's conviction as a felony.  To conclude otherwise based on the mere existence of other accurate sources -- which no evidence indicates the authors or publishers were aware of or reviewed -- would impermissibly allow Mr. Blankenship to defeat summary judgment through conjecture and

the stacking of inference upon inference.  See Graves v. Lioi, 930 F.3d 307, 324 (4th Cir. 2019).  With respect to these defendants, the record evidence, at most, suggests that while they had no reason to doubt the accuracy of the sources relied upon, a more thorough investigation may have correctly revealed that Mr. Blankenship was not a felon.  Such evidence, however, is insufficient to demonstrate reckless disregard for the truth.  See Horne, 893 F.3d at 211 (explaining "[t]he failure to investigate, where there was no reason to doubt the accuracy of the sources used cannot amount to reckless conduct." (internal citations omitted)); see also Ryan v. Brooks, 634 F.2d 726, 734 (4th Cir. 1980).

        Third, in regard to the N&G article (titled in part "Don Blankenship: A Felon, A Racist") and the Mediaite article (titled "WV Senate Candidate Defends Horrifying Campaign Ad: 'There's No Mention of a Race' Like 'Negro'") written by Tamar Auber, Mr. Blankenship avers the articles' alleged animus towards him demonstrates actual malice.  For example, Mr. Blankenship notes the title of N&G's article referring to him as "a racist."[33]  See ECF 905-2.  He also contends the substance of

---

        [33] In his response brief, Mr. Blankenship also references a video, hosted by Dan Rather titled "Dan Rather: Why Trump is Sabotaging Republican Don Blankenship," which he contends was published on N&G's website on May 7, 2018, the same date the article at issue was published.  See ECF 905 at 4, 12-13.  Mr.

Ms. Auber's article implies that he is a racist.  See ECF 948 at

11.  To this point, the Supreme Court of Appeals of West

Virginia has stated:

> [I]ll will towards the subject of a libel, and other
> 'malicious' motives, may be considered by the jury in
> their determination of whether a subjective
> realization that the statement was false or a
> subjective realization that the statement was being
> published recklessly existed at the time the statement
> was published.

Hinerman, 423 S.E.2d at 573.  Importantly, however, "animus

toward the subject of a libel[] or other 'malicious' motives are

not, alone, conclusive evidence of actual malice."  Id.

Similarly, while the United States Supreme Court has explained

that "it cannot be said that evidence concerning motive . . .

never bears any relation to the actual malice inquiry," Harte-

Hanks, 491 U.S. at 668, it "consistently has held that 'the

---

Blankenship asserts that the video further demonstrates N&G's
animus towards him and otherwise demonstrates that the article's
author knew he was not a felon or acted with reckless disregard
as to that fact.  See id.  Notably, the video is not in the
record and Mr. Blankenship only cites to the URL of the webpage
where the video can be found.  See id. at 4 n.3, 13 n.5 (citing
https://www.newsandguts.com/video/dan-rather-trump-sabotaging-
republican-don-blankenship/).  In its reply brief, N&G objects
to the video on the ground that it has not been disclosed in
discovery or made part of the record.  See ECF 934 at 7 n.2.
Mr. Blankenship has not responded to this objection.  The court
concludes that Mr. Blankenship failed to disclose the video as
required under Federal Rules of Civil Procedure 26(a) and (e)
and has not shown that the failure was substantially justified
or harmless.  Accordingly, the court will not consider the video
as evidence on N&G's motion for summary judgment.  See Fed. R.
Civ. P. 37(c).

actual malice standard is not satisfied merely through a showing
of ill will or malice in the ordinary sense of the term.'"
<u>Reuber</u>, 925 F.2d at 715 (quoting <u>Harte-Hanks</u>, 491 U.S. at 666).

Even assuming the title of N&G's article or the
substance of Ms. Auber's article demonstrates animus toward Mr.
Blankenship, such evidence alone is insufficient to establish
actual malice by clear and convincing evidence.  Inasmuch as Mr.
Blankenship has failed to produce any other affirmative evidence
of actual malice on the part of N&G, Mediaite, or Ms. Auber, the
mere allegation of animus cannot alone save his claims against
them.

Based on the foregoing, Mr. Blankenship has failed to
produce clear and convincing evidence of actual malice regarding
defendants N&G, Eli Lehrer, Mediaite, Tamar Auber, FiscalNote,
and HD Media.  Accordingly, these defendants are entitled to
summary judgment on the defamation claims against them.

## 2.   CNN

Mr. Blankenship alleges four defamatory statements were orally stated during live CNN broadcasts by three separate individuals: (1) Kevin McLaughlin; (2) Joe Lockhart; and (3) S.E. Cupp.[34]

Regarding Mr. McLaughlin, Mr. Blankenship contends "it is difficult to believe that Ms. Bash, who personally invited Mr. McLaughlin to appear on the [CNN Newsroom] broadcast," did not inform him that Mr. Blankenship was only convicted of a misdemeanor prior to his appearance on the show.  ECF 906 at 18. He also notes Mr. McLaughlin's testimony that his research "led [him] to believe [Mr. Blankenship] was a convicted felon" and contends Mr. McLaughlin's credibility on this point is a question for the jury.  ECF 884-21 at 5; ECF 906 at 17.  Neither contention amounts to affirmative evidence of actual malice. Indeed, the record evidence demonstrates that Ms. Bash did not discuss Mr. Blankenship's criminal history with Mr. McLaughlin prior to the broadcast.  See ECF 935-1 at 6-7.  Moreover, Mr. Blankenship cannot create a genuine dispute of material fact on the issue of actual malice by merely asserting that a jury could

---

[34] Although named as individual defendants in Mr. Blankenship's amended complaint, the court dismissed these individuals in its March 31, 2021, memorandum opinion and order on personal jurisdiction grounds.  See ECF 398.

possibly question the credibility of Mr. McLaughlin or Ms. Bash's testimony.  See Anderson, 477 U.S. at 256 (explaining that a plaintiff cannot defeat summary judgment "by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of . . . legal malice.").

To the extent Mr. Blankenship avers Mr. McLaughlin's reference to him as a felon "only minutes" after Ms. Bash correctly stated he was convicted of "just a misdemeanor" amounts to clear and convincing evidence of actual malice, the court declines to conclude the same on so slender a reed.  ECF 906 at 16.  The record evidence is of "insufficient caliber" to permit a reasonable jury to conclude by clear and convincing evidence that Mr. McLaughlin knew his reference to Mr. Blankenship as a felon was false or that he seriously doubted the same to be true at the time he spoke.[35]  Anderson, 477 U.S. at 254.

---

[35] The court notes that CNN avers Mr. McLaughlin's statements cannot impute liability on CNN given that he was not an employee of CNN but merely an unpaid guest.  See ECF 885 at 14 n.5.  Mr. Blankenship appears to contend Mr. McLaughlin's state of mind can be attributed to CNN under an apparent agency theory.  See ECF 906 at 22-24.  The court declines to address this issue here because regardless of whether Mr. McLaughlin's state of mind can be imputed to CNN, Mr. Blankenship is unable to demonstrate that he acted with actual malice.

As to Mr. Lockhart, Mr. Blankenship contends Mr. Lockhart's lack of research regarding his conviction and alleged animus towards him by implying he is "racist" and "crazy" create genuine disputes of fact on the issue of actual malice.  See ECF 906 at 21.  As previously mentioned, actual malice is "not measured by whether a reasonably prudent man would have . . . investigated before publishing." St. Amant, 390 U.S. at 731. Nor is "'the actual malice standard . . . satisfied merely through a showing of ill will or malice in the ordinary sense of the term.'" Reuber, 925 F.2d at 715 (quoting Harte-Hanks, 491 U.S. at 666).  Mr. Lockhart testified during his deposition -- and likewise stated in his affidavit -- that he believed Mr. Blankenship was a felon as he understood that term and was not aware that his conviction was for a misdemeanor when he uttered the statement.  See ECF 884-24 at 67-68; ECF 884-24 ¶¶ 6-7.  Mr. Blankenship has failed to produce clear and convincing evidence that would permit a reasonable jury to conclude otherwise.

As to Ms. Cupp, Mr. Blankenship contends the fact that she admitted to watching "portions of the debate where Mr. Blankenship made clear that he was never convicted of a felony" prior to calling him a felon on two subsequent occasions amounts to clear and convincing evidence of actual malice.  ECF 906 at 19.  This assertion, however, is a plain misrepresentation of

Ms. Cupp's deposition testimony.  Ms. Cupp testified that she watched certain clips and portions of the debate but had no memory of hearing or seeing the portion wherein Mr. Blankenship referred to his conviction as a misdemeanor.  See ECF 884-29 at 10; see also ECF 906-3 at 5.  Mr. Blankenship has offered no affirmative evidence contradicting this testimony.

Instead, Mr. Blankenship avers that "as a matter of logic" an unidentified "staff member" must have watched that portion of the debate and "intentionally chose" to omit the same from the clips provided to Ms. Cupp.  ECF 906 at 20.  Such contention is no more than pure speculation.  Nonetheless, the court fails to see how the same would be relevant in determining whether Ms. Cupp uttered the statements with actual malice.  To the extent Mr. Blankenship contends Ms. Cupp's testimony[36] that she viewed some of the comments made by Mr. Blankenship during his campaign to be "offensive" and "racist" demonstrates actual malice, this contention fails for the same reasons explained above respecting Mr. Lockhart.[37]

---

[36] During her deposition, Ms. Cupp was asked about Mr. Blankenship's "comments about China" and whether she believed "in May of 2018 that Mr. Blankenship's comments were racist," to which she responded that she "found them offensive and believed they sounded racist."  ECF 906-3 at 134.

[37] The parties dispute whether Ms. Cupp's and Mr. Lockhart's statements can impute liability on CNN given that they are

Lastly, Mr. Blankenship asserts that the speakers violated CNN's commitment to "accurate, fair and responsible reporting" as set forth in its internal News Standards and Practices when they falsely referred to him as a felon or convicted felon.  ECF 906 at 1.  He contends this alleged violation of CNN's standards is evidence of actual malice.  <u>Id.</u> at 5.  The court does not agree.  To assert that an entity's generalized commitment or mission to ensure "accurate, fair, and responsible" reporting amounts to an internal "standard" that is violated and actionable anytime an inaccurate statement is made is unfounded.  Moreover, "there is a significant difference between proof of actual malice and mere proof of falsity." <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 511 (1984).  Simply put, merely contending the authors' statements were false, as Mr. Blankenship does here, fails to establish actual malice.  In sum, the court concludes that Mr. Blankenship has failed to demonstrate by clear and convincing evidence that any of these three individuals subjectively doubted what they stated on air to be true or knew their statements to be false at

---

independent contractors and not employees.  <u>See</u> ECF 885 at 14 n.5; ECF 906 at 22.  Again, the court need not address this issue because regardless of whether CNN can be held vicariously liable for their statements, Mr. Blankenship has failed to produce clear and convincing evidence that they acted with actual malice.

the time they were made.  Accordingly, he has failed to produce
sufficient evidence that CNN acted with actual malice.

### 3.  ABC

John Verhovek authored the ABC online article at issue
referencing Mr. Blankenship as a "convicted felon."  The article
was subsequently linked and posted on various ABC social media
sites, accompanied by paraphrased language of the article's lead
sentence, including the convicted felon reference.  Mr.
Blankenship avers that ample evidence, including Mr. Verhovek's
own statements in his affidavit, amounts to irrefutable proof
that he acted with actual malice at the time of publication.

Mr. Blankenship primarily relies on the portions of
Mr. Verhovek's affidavit wherein he admits to authoring or co-
authoring three prior articles that passively reference Mr.
Blankenship's conviction as a misdemeanor and receiving internal
emails providing updates on the West Virginia Senate race or
article previews that, in some instances, made the misdemeanor
reference.[38]  See ECF 888-4 ¶¶ 23, 24, 29.  In the court's view,

---

[38] ABC attached these prior articles to its motion.  See ECF
Nos. 888-17; 888-18; 888-19.  It also attached an internal email
received by all ABC news campaign digital reporters, including
Mr. Verhovek, containing a preview of an article authored by
Meridith McGraw that references Mr. Blankenship's misdemeanor
conviction.  See ECF 888-21.

however, such admissions fail to tip the scales towards clear and convincing evidence of actual malice when viewed in connection with the entirety of the evidentiary record.

Mr. Verhovek's affidavit states that when he authored the article, he believed the reference to Mr. Blankenship as a convicted felon was accurate, nor did he "have any doubt about the language [he] was using." ECF 888-4 ¶ 34. Mr. Verhovek explains that at the time of publication, he "understood and used the term 'felony' to mean 'serious crime,' and the term 'felon' to mean 'someone who committed a serious crime.'" Id. ¶ 19. He further states that "[g]iven his understanding of the term 'convicted felon,' [he] would not have thought it was inaccurate to use in referring to an individual who was convicted of a crime serious enough to result in a full year in federal prison." Id. While acknowledging the existence of the three previous articles referencing Mr. Blankenship's misdemeanor conviction, Mr. Verhovek states that when he authored the article at issue roughly two months later, he did not recall the prior articles. Id. ¶ 26.

Mr. Verhovek goes on to state that even if he had referenced his prior articles before authoring the article at issue, he "still would have thought the term 'convicted felon' was an accurate way to refer to Mr. Blankenship because [he]

understood (and was using) the term in a colloquial way of referring to someone who had been convicted of a serious crime, not as a legal technical term." Id. ¶ 32.  He avers the seriousness of Mr. Blankenship's crime "was reflected in both the lengthy federal prison sentence and the nature of the crime itself" and "[s]eeing the term 'misdemeanor' would not have made an impression on [him], because [he] was focused on the fact that [Mr. Blankenship] had been convicted of a serious crime, rather than the formal classification of the crime in the relevant statute." Id.

Importantly, Mr. Verhovek's asserted misunderstanding as set forth in his affidavit is supported by his contemporaneous communications with his former colleague Meridith McGraw upon being notified of his error.  Indeed, Mr. Verhovek's confusion is readily apparent from his eventual response to Ms. McGraw's email notifying him of the error, which states "Meridith can you send me exact language on this? Blankenship was sent to federal prison[,] but he was not convicted of a felony?"  ECF 888-24.  Mr. Verhovek then sent a series of text messages to Ms. McGraw, wherein he pertinently states, "Sorry about Blankenship, I thought I had it right on that or seen it in an earlier story, that's my bad [. . .] I

just wish I'd been more careful." ECF 888-49.  His error was quickly corrected.

"[C]hoice of . . . language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." <u>Bose Corp.</u>, 466 U.S. at 513.  Mr. Verhovek's contemporaneous communications with Ms. McGraw indicate his reference to Mr. Blankenship as a convicted felon amounts to little more than a genuine misconception or mistake, and not a knowing falsity or a reckless disregard for the truth.  Mr. Blankenship has failed to produce clear and convincing evidence to the contrary and instead resorts to the same assertions that the court has already dispelled throughout this opinion in efforts to save his claim.

Mr. Blankenship's bald assertions that it is hard to believe a well-educated individual would not know the legal definition of a felony, a more thorough investigation may have correctly revealed the truth, and the sheer fact that other news sources had correctly reported his conviction all fail to establish clear and convincing evidence of actual malice on the part of ABC.  Nor does his assertion -- that Mr. Verhovek's failure to reach out to him for comment prior to the article's publication is indicative of actual malice -- fare any better.

Simply put, the entirety of the evidentiary record lacks the convincing clarity necessary for a reasonable jury to conclude that ABC had actual knowledge of falsity or serious doubts as to the article's truth at the time of publication.  ABC is thus entitled to summary judgment on these grounds.

### 4.  The Washington Post

Mr. Blankenship alleges the Washington Post published three publications referencing him as a felon authored by four separate individuals: (1) Dana Milbank; (2) Jenna Johnson and Josh Dawsey; and (3) Amber Phillips.  The court will address each article in turn.

As a threshold matter, the parties dispute whether the "even felons" reference in Mr. Milbank's article stating, "[n]ow we have Blankenship, Roy Moore, Joe Arpaio and a proliferation of name-calling misfits and even felons on Republican ballots" was about Mr. Blankenship.  ECF Nos. 886-19; 886-21.  The Washington Post contends the reference could only be logically read as referring to persons other than Mr. Blankenship.  ECF 887 at 12.  It further emphasizes that the online version of the article contained a hyperlink on the "even felons" text, linking to another article discussing former New York Congressman

Michael Grimm's felony conviction, which accurately referenced Mr. Blankenship's conviction as a misdemeanor.  Id.

Mr. Blankenship, on the other hand, asserts that any "reasonable reader" could read the reference as concerning him given that, in a preceding paragraph of the article, Mr. Milbank notes that Mr. Blankenship spent a year in prison.  ECF 910 at 16.  Mr. Blankenship also notes that the print version of the article obviously contained no hyperlink to the other article regarding Michael Grimm.  Id. at 11.  Regardless of whether the statement can be read as concerning Mr. Blankenship, he has failed to produce any evidence whatsoever that would support his bare assertion that Mr. Milbank authored the article with actual malice.  Mr. Milbank stated in his affidavit that he "was not aware that anything [he] wrote about Mr. Blankenship was inaccurate – nor did [he] have any doubts about the truth of anything [he] wrote" in his May 8, 2018, article.  ECF 886-20 ¶ 5.  Mr. Blankenship has not produced a scintilla of evidence that would permit a reasonable juror to conclude otherwise, let alone by clear and convincing evidence.  Accordingly, Mr. Milbank's statements fail to demonstrate that the Washington Post acted with actual malice. See Sullivan, 376 U.S. at 287-88 (noting that "the state of mind required for actual malice [has] to be brought home to the persons in the [defendant's]

organization having responsibility for the publication[.]"; see also <u>Mimms v. CVS Pharmacy, Inc.</u>, 889 F.3d 865, 866 (7th Cir. 2018) (noting that under <u>Sullivan</u> "[i]t is the state of mind of the speaker that is relevant" to the actual malice inquiry.).

The court reaches the same conclusion regarding the July 25, 2018, article authored by Jenna Johnson and Josh Dawsey, which was subsequently republished in print on July 27, 2018. While both authors are listed on the by-line of the article, the uncontradicted evidentiary record establishes that it was Ms. Johnson who wrote the statement referring to Mr. Blankenship as a "felon." Indeed, both Ms. Johnson and Mr. Dawsey state as much in their affidavits. See ECF Nos. 886-26 ¶ 4; 886-27 ¶¶ 2-4.[39] Additionally, Ms. Johnson sent an email to

---

[39] To the extent Mr. Blankenship contends Mr. Dawsey was also responsible for the "felon" reference inasmuch as he participated in reviewing the article, such contention is unsupported by the evidentiary record. Mr. Dawsey testified during his deposition that he only reviewed the portions of the story wherein his reporting was used, which were boldfaced for his review in the email sent to him from Ms. Johnson prior to the article's publication. See ECF 886-35 at 4-5. Regardless, the record does not support a finding of actual malice on the part of Mr. Dawsey by clear and convincing evidence. Mr. Blankenship points to an April 19, 2018, article authored in part by Mr. Dawsey and three emails he received, wherein Mr. Blankenship's conviction is accurately referenced as a misdemeanor. ECF 910-8. Mr. Dawsey testified, however, that he had no role in authoring the portion of the article containing the misdemeanor reference nor did he ever recall reading and/or receiving the emails. ECF 886-35 at 6-13. Mr. Blankenship has offered no evidence demonstrating otherwise.

Mr. Dawsey prior to the article's publication wherein she boldfaced the text of the draft article where his reporting was used, which did not include the coverage of the West Virginia primary or the felon reference.  See ECF 886-27.  Mr. Blankenship has again produced no affirmative evidence that would permit a finding that Ms. Johnson authored the statement with actual malice.  Instead, he contends that Ms. Johnson's assertion that she believed what she wrote to be true creates a credibility issue for the jury and that her failure to conduct a proper investigation amounts to actual malice.  Neither contention, however, holds any merit.  See Anderson, 477 U.S. at 256 (explaining that a plaintiff cannot defeat summary judgment "by merely asserting that the jury might, and legally could, disbelieve the defendant's denial of . . . legal malice."); see also St. Amant, 390 U.S. at 731 (actual malice is "not measured by whether a reasonably prudent man would have . . . investigated before publishing.").

     As to the August 9, 2018, online blog post authored by Ms. Phillips, in which she refers to Mr. Blankenship as one of three convicted felons who have run or are running for office in 2018, Mr. Blankenship first asserts that three mass emails received by Ms. Phillips -- prior to the article's publication -- that passively reference Mr. Blankenship's misdemeanor

conviction amount to clear and convincing evidence of actual
malice.  The court does not agree.  Ms. Phillips states in her
affidavit that she does not recall reading these three emails --
let alone focusing" on the misdemeanor references.  ECF 886-31 ¶
5.  She also notes that during the time the piece was written,
she "received thousands of emails and wrote more than one
hundred other pieces."  Id.  Mr. Blankenship has produced no
evidence to the contrary.

Even assuming Ms. Phillips had read the three mass
emails at issue -- a political newsletter, a blast from a
political group, and a mass circulation of a CBS "Face the
Nation" transcript -- the fleeting references to Mr.
Blankenship's misdemeanor conviction contained therein would not
give rise to clear and convincing evidence of actual malice when
she used the convicted felon reference on August 9, 2018.
Simply put, the court is unconvinced that one-word references to
Mr. Blankenship's misdemeanor conviction embedded within the
text of these mass emails serve to demonstrate that Ms. Phillips
subjectively disbelieved her statement or knew it to be false at
the time of the August 9, 2018, publication by clear and
convincing evidence.

Mr. Blankenship next contends that a blog post written
by Ms. Phillips three months prior to August 9, 2018, wherein

71

she accurately referenced Mr. Blankenship's conviction as a misdemeanor, is clear and convincing evidence of actual malice. For similar reasons as explained supra regarding Mr. Verhovek and ABC, the court is unpersuaded by this contention.  In her affidavit, Ms. Phillips explains that when she wrote the phrase "convicted felons" in her blog post, "it was [her] understanding that the word 'felon' could be used to refer to someone who has been convicted of a crime and that it was used that way in common usage."  ECF 886-31 ¶ 4.

At the time the blog post was drafted, Ms. Phillips "was aware that Mr. Blankenship had been convicted of a crime and served a year in federal prison" and "was using 'felon' in the colloquial sense." Id.  She further states that she "did not appreciate or focus in writing this [reference] on any technical meaning that 'felon' may have."  Id.  In sum, she states that it never occurred to her that the term "'felon' was a word that required further fact checking" given her knowledge that Mr. Blankenship had spent time in prison for a serious crime.  Id.

The fact that Ms. Phillips wrote a single article correctly describing Mr. Blankenship's conviction as a misdemeanor does not amount to clear and convincing evidence that she subjectively understood the legal denotation of the

word felon at the time she published the blog post at issue approximately three months later.  The evidentiary record, at best, demonstrates that Ms. Phillips failed to recognize the technical inaccuracy associated with passively referring to Mr. Blankenship as a convicted felon.  While an unfortunate choice of words, the court declines to permit the actual malice issue to reach the jury on what appears from the evidentiary record to be an innocent mistake in legal terminology.  See Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp., 951 F.3d 952, 958 (8th Cir. 2020) (concluding the "[f]ailure to recognize a mistake or ambiguity and its potential consequences is not evidence of reckless disregard for the truth.").

When viewed in its entirety, the record fails to demonstrate with convincing clarity that Ms. Phillips knew her statement to be false or that her conduct "approach[ed] the level of publishing a knowing, calculated falsehood."  Ryan, 634 F.2d at 733.  Importantly, "the First Amendment does not require perfection from the news media."  Carr v. Forbes, Inc., 259 F.3d 273, 283 (4th Cir. 2001).  This is so because, "[w]ere the press subject to suit every time it erred," much of news reporting would be severely chilled.  Id.  The Constitution thus "provides the press with a shield whereby it may be wrong when commenting on acts of a public figure, as long as it is not intentionally

or recklessly so." Id.  In other words, a mere mistake cannot constitute actual malice, and the court is unpersuaded that Mr. Blankenship has produced clear and convincing evidence demonstrating that Ms. Phillip's error amounts to more than a genuine misconception.

To the extent Mr. Blankenship points to the Washington Post's internal standards regarding a commitment to truthful reporting and its general policy noting that reporters are primarily responsible for fact checking their stories, this does not equate to clear and convincing evidence of actual malice. As reiterated throughout this opinion, even an "extreme departure from professional standards" is constitutionally insufficient to establish clear and convincing evidence of actual malice.  Harte-Hanks, 491 at 665.  Based on the foregoing, the Washington Post is entitled to summary judgment inasmuch as Mr. Blankenship has failed to produce clear and convincing evidence of actual malice.

5.   MSNBC


Mr. Blankenship contends that he was defamed during
three separate broadcasts of the MSNBC program <u>All In</u>, once by
guest-host Joy Reid and twice by host Chris Hayes.[40]  As
previously stated herein, "the state of mind required for actual
malice [has] to be brought home to the persons in the
[defendant's] organization having responsibility for the
publication[.]"  <u>Sullivan</u>, 376 U.S. at 287-88.  In his briefing,
Mr. Blankenship contends the individuals responsible at MSNBC
for falsely referring to him as a convicted felon include Mr.

---

[40] In his complaint, Mr. Blankenship also alleges Mr. Hayes
defamed him in an April 16, 2018, tweet posted on Mr. Hayes
personal twitter account, wherein Mr. Hayes referred to Mr.
Blankenship as a "felonious coal baron."  ECF 14 ¶ 169.  In its
opening brief, MSNBC contends the tweet cannot form the basis
for MSNBC's corporate liability inasmuch as it was made on Mr.
Hayes' personal account, "which is not sponsored, overseen, or
operated by MSNBC."  ECF 883 at 12.  Mr. Blankenship appears to
concede as much given that he does not address this contention
in his response brief and instead only focuses on the three
statements made during the live broadcasts of the <u>All In</u>
program.  <u>See</u> ECF 911 at 4 ("All of MSNBC's defamatory
statements were made on the <u>All In</u> television program.").  The
only references to the tweet in Mr. Blankenship's response brief
appear in passing, once in a footnote (stating "Hayes also
tweeted that Mr. Blankenship was a 'felonious coal baron found
responsible for dozens of miners' deaths'") and once in a single
sentence (stating "MSNBC concedes, as it must, that Hayes called
Mr. Blankenship 'felonious' in a tweet and a 'convicted felon'
twice on All In . . .").  ECF 911 at 8 n.3, 14.  The court thus
concludes the April 16, 2018, tweet is insufficient to establish
MSNBC's liability inasmuch as it was tweeted from Mr. Hayes'
personal account.

Hayes, <u>All In</u> Executive Producer Denis Horgan, and "the 22

member staff of the <u>All In</u> television program."[41]   ECF 911 at 5.

As to Mr. Horgan, Mr. Blankenship contends he bears

responsibility for the challenged statements inasmuch as he "has

the responsibility for overseeing and approving all scripts" for

the show.   <u>Id.</u>  Aside from this bare assertion, the record is

devoid of any evidence that Mr. Horgan wrote or worked on the

scripts containing the convicted felon references.  When Ms.

Reid was asked in her deposition if she had worked with Mr.

Horgan on the scripts when she guest-hosted, she responded:

> I did not work with Denis Horgan on the scripts for
> those shows, you know, because he is, as the executive
> producer, he is not writing the scripts.  He is
> assigning the producers who write the scripts, and
> he's overseeing the process overall.  So, I worked
> with him overall on the show.

ECF 911-5 at 16.  Merely being responsible for the "overall

process" of the show does not equate to Mr. Horgan being

responsible for the challenged statements at issue.  When Mr.

Horgan was asked during his deposition whether he had "ever

approved a script in which a misdemeanor was referenced as a

convicted felon during [his] tenure as executive producer" Mr.

Horgan testified during his deposition that he did not know.

---

[41] Presumably, Ms. Reid would be included.

ECF 911-6 at 24.  Mr. Blankenship has presented no evidence that would call this testimony into question.

As to the twenty-two member staff of the <u>All In</u> program, Mr. Blankenship has failed to identify any of the staff members who may have been involved in the drafting of the scripts at issue.  The court is thus unable to assess each staff member's state of mind without knowing who those individuals are or if they were even involved in the drafting process. Accordingly, in assessing actual malice, the court will focus on the states of mind of the individuals who spoke the challenged statements -- Ms. Reid and Mr. Hayes -- during the broadcasts at issue.  <u>See</u> <u>Mimms</u>, 889 F.3d at 866 (noting that under <u>Sullivan</u>, "[i]t is the state of mind of the speaker that is relevant" to the actual malice inquiry.).

Mr. Blankenship first avers that Ms. Reid and Mr. Hayes' departure from MSNBC's standards and practices amounts to evidence of actual malice.  He relies on MSNBC's internal policies and guidelines, which provide that MSNBC "stands for accuracy, fairness, independence and integrity," and contends Ms. Reid and Mr. Hayes violated this provision by falsely referring to him as a convicted felon.  ECF 911 at 14.  The court is yet again unpersuaded by this assertion for the same reasons as discussed regarding CNN.  To assert that a

generalized commitment to accuracy, fairness, and integrity as set forth in the "Forward" section of NBCUinversal's News Group Policies and Guidelines amounts to a set standard that is violated and actionable anytime an inaccurate statement is made is untenable.  <u>See</u> ECF 934-4 at 13.  Moreover, "there is a significant difference between proof of actual malice and mere proof of falsity."  <u>Bose</u>, 466 U.S. at 511.  Simply contending that Ms. Reid's and Mr. Hayes' statements were untrue does little to prove that they subjectively disbelieved their statements at the time they were made.

Regarding Ms. Reid, the uncontradicted evidence in the record demonstrates that she believed Mr. Blankenship was a convicted felon at the time she referenced him as such.  <u>See</u> ECF 882-8 ¶¶ 7-8; <u>see also</u>  882-7 at 10-11.  Mr. Blankenship has failed to produce a scintilla of evidence that would permit a reasonable jury to conclude otherwise.  Instead, Mr. Blankenship contends Ms. Reid's discussion on a January 8, 2018, episode of <u>All In</u>, during which she referred to Mr. Blankenship's conviction but did not call him a felon, serves as evidence that she acted with actual malice when she subsequently called him a convicted felon during the May 4, 2018, episode at issue.  This contention is without merit.  Although Ms. Reid may have referenced Mr. Blankenship's conviction on the January 8, 2018,

episode, the transcript of the episode demonstrates that she did not refer to the conviction as a misdemeanor. See ECF 938-3 at 22. The record is devoid of any evidence demonstrating that Ms. Reid acted with actual malice at the time her statement was made.

The record is more extensive as to whether Mr. Blankenship has adduced evidence of convincing clarity demonstrating that Mr. Hayes uttered his statements with actual malice when he referred to Mr. Blankenship as a convicted felon during the April 23, 2018, and May 9, 2018, broadcasts of All In. As evidence of actual malice, Mr. Blankenship first points to a November 29, 2017, broadcast of All In hosted by Mr. Hayes, during which two articles -- a wchstv.com article and an article from The New Yorker, both of which accurately reported Mr. Blankenship's conviction -- were used as sources for the graphics of their headlines displayed during that segment. This contention, however, is unavailing inasmuch as neither of the articles' displayed headlines made reference to Mr. Blankenship's conviction nor is it alleged that the segment discussed the legal classification of Mr. Blankenship's conviction at any point.[42] The images of the headlines displayed

---

[42] The court notes that neither the video segment nor a transcript of the November 29, 2017, broadcast wherein the

during the broadcast read: "Former Massey Energy CEO Don
Blankenship to Run for Senate" and "Don Blankenship, West
Virginia's King of Coal is Guilty."[43]  See ECF 938-2 at 6, 9; see
also ECF 911-6 at 13, 16, 30.  While the bodies of the articles
accurately referenced Mr. Blankenship's conviction as a
misdemeanor, see ECF 911-6 at 17, 31, Mr. Blankenship has
produced no evidence that Mr. Hayes read either of the articles,
nor did Mr. Blankenship even ask Mr. Hayes about these articles
at any point during Mr. Hayes' deposition.  The articles are
thus of no significance in the effort to demonstrate that Mr.
Hayes acted with actual malice.

       Mr. Blankenship next points to an April 6, 2016, email
sent from an All In staff member, Brendan O'Melia, to Mr. Hayes
and other staff members with the subject line "our old friend
Don Blankenship going to the cooler for a year."  ECF 911-6 at
28.  The body of the email contains, what appears to be, an
article headline stating: "Former Massey Energy CEO Don

_____

article headlines were purportedly displayed appear to be in the
record.

       [43] As to The New Yorker article titled "Don Blankenship,
West Virginia's King of Coal is Guilty," the court notes that
Mr. Horgan testified during his deposition that the article's
headline and "a quote from it" were displayed as graphics during
the November 29, 2017, broadcast.  ECF 911-6 at 17.  Neither
party, however, has identified what quote from the article
appeared as a graphic.

Blankenship receives maximum sentence."[44]  Id.   The email, however, is of little significance given that it does not mention the nature of Mr. Blankenship's conviction.

Lastly, Mr. Blankenship relies on a December 2015, email chain between All In's executive producer Denis Horgan, Mr. Hayes, and other staff members of the All In program.  The email thread begins with Mr. Horgan emailing Mr. Hayes and other staff members a link to a New York Times article on December 3, 2015, which reported that Mr. Blankenship had been found guilty of the misdemeanor offense that same date.  See ECF 911-4 at 64. Mr. Hayes responded to the email "He only got nailed on the misdemeanor, tho[ugh].  Probably not a day in jail."  Id. at 63.[45]  Mr. Blankenship contends Mr. Hayes' response amounts to

---

[44] The email also appears to contain a link to a news article, however, neither party has furnished a copy of this article in the record, nor does either party discuss the contents of the article in their briefing.

[45] Two All In staff members, Todd Cole and Gregg Cockrell, replied to the email.  Mr. Cole replied "A slap on the wrist for a dude who killed 29 people.  Maybe if he used an assault rifle, he would have been convicted of murder."  ECF 911-4 at 63.  Mr. Cockrell replied, "Very disappointing . . . he's killed more people than most terrorists ever do."  To the extent Mr. Blankenship avers their replies amount to clear and convincing evidence that the staff members of the All In show acted with actual malice, the court is unpersuaded inasmuch as Mr. Blankenship has provided no evidence that these individuals were involved in the drafting of the scripts wherein Mr. Blankenship was referred to as a convicted felon over two years later. Their responses are thus of little evidentiary value regarding the actual malice inquiry and are certainly of little to no

clear and convincing evidence that Mr. Hayes knew his references to Mr. Blankenship as a convicted felon over two years later were false and thus were made with actual malice.  Mr. Hayes' response, however, cannot be viewed in isolation, and when viewed in connection with the entirety of the evidentiary record, the court finds the email to be of attenuated effect.

Mr. Hayes stated in his affidavit that when he referred to Mr. Blankenship as a convicted felon during the April 23, 2018, and May 9, 2018, broadcasts, and purportedly in his personal tweet on April 16, 2018, he knew that Mr. Blankenship "had been convicted of a serious crime and spent a year in prison after a fatal mine explosion, and [that he] believed that crime was a felony."  ECF 882-5 at ¶¶ 8-10. Similarly, Mr. Hayes testified during his deposition that when he uttered the challenged statements, he "knew [Mr. Blankenship] had done a year in federal prison and . . . thought that meant he had been convicted of a felony" and that he "was trying to convey the seriousness of the crime" when he made the convicted felon reference.  ECF 882-6 at 40, 41.

---

relevance in assessing whether Ms. Reid or Mr. Hayes -- the speakers of the challenged statements -- acted with actual malice at the time the statements were made.

Importantly, Mr. Hayes' asserted belief appears to be supported by a contemporaneous, pre-show recorded discussion between Mr. Hayes and his segment producer Brian Montopoli before the first challenged statement was made.  This discussion took place on April 23, 2018, while the two were preparing for what would be discussed on that evening's <u>All In</u> broadcast.[46]

During the discussion, Mr. Montopoli suggests that they play a portion of their "old buddy Don Blankenship's ad"[47] during the segment wherein Mr. Blankenship states "We don't need to investigate our president. We need to arrest Hillary. Lock her up."  ECF 882-6 at 17.  In response, Mr. Hayes replies "Holy . . . shit, Dude.  [T]hat is, like, convicted felon . . . Don Blankenship . . . the man who was found, you know, to have criminally violated the law in the mine that he owned that killed, you know, all those miners," to which Mr. Montopoli

---

[46] Mr. Hayes explained in his deposition that sometimes his segment producers will record meetings to later assist them in "transcrib[ing] [his] words . . . dictated in the meeting."  ECF 882-6 at 21.  He further explained that these recordings are "completely confidential" as they are "internal editorial deliberation[s] for . . . the generation of a script."  <u>Id.</u>

[47] Mr. Blankenship contends Mr. Montopoli's reference to him as "old buddy" is indicative of actual malice inasmuch as it "reinforces that a jury could readily find that Hayes and his Staff's familiarity with [him] is strong evidence that Hayes and his Staff knew the truth about [his] conviction."  ECF 911 at 16.  The court, however, fails to see how the term "old buddy" is indicative of what Mr. Hayes knew about Mr. Blankenship's conviction at the time the statement was made.

replied "Yeah."  Id.  This candid, off-air discussion between Mr. Hayes and Mr. Montopoli appears to reinforce Mr. Hayes' contention that he genuinely believed Mr. Blankenship was a convicted felon when he stated as much on air later that same evening, not that he intentionally and knowingly uttered a calculated falsehood.  When asked about this private discussion during his deposition, Mr. Hayes testified "I called him a convicted felon in the conversation because I thought he was a convicted felon, clearly."  ECF 938-1 at 20.

Mr. Hayes' assertion that he believed Mr. Blankenship was a convicted felon at the time he referred to him as such on the April 23, 2018, and May 9, 2018, broadcasts of All In is further supported by an email communication with a viewer of the show on May 10, 2018.  Mr. Hayes received an email from the viewer on the evening of May 10, 2018, stating: "You mentioned that Blankenship was a Felon on your Thing 1/2 Segment. Unfortunately it was a misdemeanor[.]  Go figure!"  ECF 938-1 at 36.  In response, Mr. Hayes stated "yes! Caught that after the show, but you're r[i]ght."  Id. (emphasis added).  This email -- sent the day after the last challenged statement was made -- further supports Mr. Hayes' contention that he believed his references to Mr. Blankenship as a convicted felon to be true at that time and did not realize his error until afterwards.  To

the extent Mr. Blankenship avers this email demonstrates MSNBC's failure to correct its misrepresentations about him, which, he says, "further bolsters that it acted with actual malice," such contention is lacking in merit. Indeed, "[a]ctual malice cannot be inferred from a failure to retract . . . a statement once the publisher learns that the statement is false." Blankenship, 451 F. Supp. at 618 (quoting Sullivan, 376 U.S. at 286); see also Pippen, 734 F.3d at 614 (noting that "[t]he Supreme Court . . . has said that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false.").

In light of these contemporaneous communications, the court concludes that Mr. Hayes' response ("He only got nailed on the misdemeanor") to Mr. Horgan's December 3, 2015, email fails to demonstrate with convincing clarity that Mr. Hayes' challenged statements -- made over two years later -- amount to more than the mistaken, imprecise use of legal terminology. Again, "[t]he Constitution provides the press with a shield whereby it may be wrong when commenting on acts of a publics figure, as long as it is not intentionally or recklessly so." Carr, 259 F.3d at 283. The court concludes that Mr. Blankenship has failed to "forecast evidence sufficient to prove actual malice by clear and convincing evidence" on the part of Mr.

Hayes.  <u>Carr</u>, 259 F.3d at 282.  Accordingly, MSNBC is entitled to summary judgment on this basis.

### 6.  Fox News

Mr. Blankenship contends that in April and May of 2018, Fox News broadcasted six defamatory statements concerning him made by six on-air broadcasters: (1) John Layfield; (2) Bradley Blakeman; (3) Stephanie Hamill; (4) Elizabeth MacDonald; (5) Judge Andrew Napolitano; and (6) Neil Cavuto.[48]

Mr. Blankenship devotes much of his briefing and supplemental briefing discussing alleged evidence of actual malice that is of little relevance in regard to what the <u>speakers</u> of the challenged statements subjectively knew at the time their statements were made.  For example, Mr. Blankenship appears to assert that some of the most telling evidence of actual malice stems from the following May 6, 2018, email sent

---

[48] The challenged statements are as follows: (1) John Layfield ("Don Blankenship was . . . convicted of safety violations which 29 people were killed . . . a felon"); (2) Bradley Blakeman ("the guy's a felon"); (3) Stephanie Hamill ("it might be difficult for him to actually win because of his issues with being a convicted felon"); (4) Elizabeth MacDonald ("the implication here . . . is that a racist felon represents the Republican party"); (5) Judge Andrew Napolitano ("he went to jail for manslaughter after people died"); and (6) Neil Cavuto: ("he's a convicted felon").

from Fox News Chairman and CEO Rupert Murdoch to Fox News

Executives Suzanne Scott and Jay Wallace:

> Both Trump and McConnell appealing for help to beat
> unelectable former mine owner who served time.
> Anything during day helpful but Sean and Laura dumping
> on him hard might save the day.

ECF 990-1.[49]  He contends the Murdoch email amounts to a "tactic

instruction to negatively shape the content of [the Fox News]

programming to defeat Mr. Blankenship's candidacy" and "[i]t is

neither accidental nor coincidental" that five of the six Fox

News speakers identified above referenced him as a felon or

convicted felon succeeding the email.[50]  ECF 1503 at 2.  To the

extent Mr. Blankenship contends that the email can be

interpreted as an explicit instruction from Mr. Murdoch to

others at Fox News to defame Mr. Blankenship by falsely

referring to him as a felon, the court is unpersuaded.

The plain text of the email lacks any instruction to

defame Mr. Blankenship by inaccurately referencing his

conviction.  At no point are the words "felon" or "convicted

---

[49] The only response to the email was from Mr. Wallace the
following day, in which he replied: "After a tweet free weekend,
[President Trump]'s back to tee up WV . . .", followed by a
direct quote of President Trump's tweet urging West Virginia
voters to vote for "Rep. Jenkins or A.G. Morrisey" and not Mr.
Blankenship.  ECF 990-1 at 9.

[50] Judge Napolitano did not refer to Mr. Blankenship as a
felon or convicted felon but incorrectly stated he was convicted
of manslaughter.

felon" used in the email.  At most, the email amounts to a call

for heavy criticism of Mr. Blankenship as a candidate for public

office, not an instruction to knowingly mischaracterize his

conviction.  Moreover, the court fails to see how the content of

the Murdoch email relates to what the speakers of the challenged

statements knew at the time the alleged defamatory references

were made.

        As reiterated throughout this opinion, "it is the

state of mind of the speaker that is relevant" in assessing

actual malice.  Mimms, 889 F.3d at 868 (citing Sullivan, 376

U.S. at 287).  The record evidence demonstrates that the content

of the Murdoch email was never shared or discussed with any of

the individuals who uttered the statements at issue or with any

other individual at Fox News.  Indeed, Mr. Murdoch, Mr. Wallace,

and Ms. Scott all confirmed as much in their affidavits, and Mr.

Blankenship has produced no affirmative evidence to the

contrary.  See ECF Nos. 990-1; 990-2; 990-3.  In fact, Mr.

Blankenship conceded at his deposition that he did not have any

evidence that Mr. Cavuto was instructed by anyone to

mischaracterize his conviction and that he was unaware whether

Judge Napolitano had received any such instruction.  See ECF

890-2 at 39, 42-43.  The Murdoch email is thus of little

evidentiary value in assessing whether the speakers acted with

88

actual malice.   For these same reasons, Mr. Blankenship's assertions that Mr. Murdoch's alleged violation of "journalism ethics standards" and his "partisanship animus" demonstrate actual malice are without merit.

As to the statement made by Mr. Cavuto, Mr. Blankenship conceded during his deposition that he had no evidence that Mr. Cavuto knew his convicted felon reference was false at the time it was made.   See ECF 890-2 at 42.   Instead, Mr. Blankenship contends Mr. Cavuto purposefully avoided the truth when he "disregarded" information alerting him that Mr. Blankenship was only convicted of a misdemeanor.   Mr. Blankenship avers this information consists of (1) a one-word reference to his conviction as a misdemeanor by Peter Doocy made on Mr. Cavuto's show in April 2018, and (2) a packet received by Mr. Cavuto on May 2, 2018, regarding the West Virginia senatorial race, which embedded therein, contains a passive reference to Mr. Blankenship's conviction as a misdemeanor. Neither Mr. Doocy's statement nor the packet, however, "provide clear and convincing evidence that Mr. Cavuto's alleged defamatory statement was "'made with [a] high degree of awareness of [its] probable falsity.'"   Horne, 893 F.3d at 212 (quoting CACI, 536 F.3d at 300).   To conclude that these meager references -- of which Mr. Blankenship has failed to establish

Mr. Cavuto was even cognizant -- caused Mr. Cavuto to seriously doubt the accuracy of his statement or purposefully avoid the truth is to ignore the bulk of the uncontradicted evidentiary record.

Mr. Cavuto explained during his deposition that at the time he called Mr. Blankenship a convicted felon he "did not draw the distinction with the misdemeanor" and "[w]hat stood out to [him] was the time he'd served in federal prison[.]" ECF 890-14 at 4.  He further explained if he had understood Mr. Blankenship was not a convicted felon, he "by all means would not have said that" given that he "had no horse in the race to do otherwise" and "want[s] to be accurate."  Id.  Mr. Cavuto's asserted misunderstanding is supported by his statements upon learning that Mr. Blankenship was not convicted of a felony. For instance, after Mr. Blankenship explained he was not a felon to Mr. Cavuto on air, Mr. Cavuto responded "[s]o what are you if you've spent time in jail?"  Id. at 5.  Similarly, after Judge Napolitano undertook to explain the legal definitions of a felony and misdemeanor on Mr. Cavuto's show, Mr. Cavuto clarified "[s]o just serving a year in jail doesn't make you a convicted felon?"  Id. at 8.  Mr. Cavuto's reference to Mr. Blankenship as a convicted felon, made on May 7, 2018, preceded these explanations.

On May 2, 2018, Mr. Cavuto received the packet, entitled "May 8th, 2018 Primary Races," which summarized information regarding the West Virginia, Ohio, and Indiana primaries.[51]  See ECF 890-30.  Regarding the West Virginia primary, the packet provided information on both the Democrat and Republican candidates running for office, including bulleted lists of "fast facts" about each individual candidate and their "campaign themes" and "platforms."  Id.  The packet also included a two-page, single-spaced "overview" of the West Virginia senate race.  Id.  On the page regarding Mr. Blankenship, the packet sets forth bulleted information -- labeled "Blankenship Fast Facts" in boldfaced font -- which provides, inter alia, that Mr. Blankenship "[r]esigned following the Upper Big Branch mine explosion in April 2010 that killed 29 miners" and that he was "[c]onvicted of conspiring to willfully violate safety standards and served one year in prison."  ECF 890-30 at 9.  The page also notes some of Mr. Blankenship's "campaign themes" and explains why he is running and his plans if elected.  The individual page on Mr. Blankenship does not

_____

[51] The court notes that it is unclear from the record how Mr. Cavuto received the packet.  It appears that the packet was put together by Natalie Aspell, an individual whom Mr. Cavuto testified "coordinated a lot of research for [him]."  ECF 953-7 at 15.  The packet was emailed from Ms. Aspell to two other individuals -- who presumably worked with Mr. Cavuto -- on May 2, 2018 and was then provided to Mr. Cavuto at some point that same date.  See ECF 890-30 at 2.

provide the legal classification of his conviction.  The

misdemeanor reference is not made until a few pages later in the

senate race "overview" section of the packet, embedded within

the following single-spaced paragraphs of information taken from

the actual packet of information and inserted as an image

herein, exactly as it appears in the packet:

On the one hand, U.S. Sen. Joe Manchin should be the most vulnerable incumbent up this cycle given that he is a Democrat representing a state that President Donald Trump carried by 42 points. On the other, Manchin has accumulated a very moderate voting record and seems in sync with voters, and thus has solid job approval and favorable ratings.[en]

Manchin was elected to the Senate in a special election in 2010 with 54 percent, and then won a full term in 2012 with 61 percent.

Republicans have two first-tier candidates seeking the GOP nomination: U.S. Rep. Evan Jenkins and Attorney General Patrick Morrisey, who has an endorsement from former White House senior adviser Steve Bannon. Former coal industry worker Bo Copley is also running, as is former coal company CEO Don Blankenship. Blankenship, who can put personal resources into the race, seems to be running in search of vindication for his 2015 conviction on a misdemeanor charge related to the Upper Big Branch Mine explosion that killed 29 miners. Either Morrisey or Jenkins will give Manchin a competitive general election, but early indications are that it will be a very contentious primary.[en]

Id. at 11.  Mr. Cavuto testified that it was "standard

procedure" to receive a packet like this towards the end of the

primary season to "generally bring you up to speed" and that the

packet could be "quite voluminous" and have "a lot of pieces to

it."  ECF 953-7 at 13-14.  While Mr. Cavuto further testified

that he "would have no doubt that [he] would have gone through"

the primary packet, id. at 17, what he focused on were the "big

bullet-point issues" regarding Mr. Blankenship's candidacy

contained therein.  Id. at 16; see also ECF 890-14 at 3.  At

best, the record evidence demonstrates Mr. Cavuto's failure to

be more careful in his review of the information he was

provided, but it does not establish that he purposefully avoided the truth by clear and convincing evidence.

Mr. Blankenship next contends that Mr. Cavuto violated Fox News' "journalism ethics standards requiring impartiality by suggesting to viewers that the Republican Party would 'lose West Virginia' if Mr. Blankenship won the Primary," which, he says, is evidence of actual malice. ECF 1053 at 18. He further avers that such statement demonstrates Mr. Cavuto's "partisanship animus" towards him. Id. at 19. In support of this contention, Mr. Blankenship relies on Fox News Executive Jay Wallace's deposition testimony wherein he responded "no" to the question of whether he believed it would have been appropriate for the host of a Fox News show "to take sides in a political race and shape the stories that they covered to either help or harm a particular candidate." ECF 1503-1 at 14.

The court is unpersuaded that Mr. Wallace's testimony amounts to evidence that Fox News maintained journalism ethics standards related to impartiality for its hosts like Mr. Cavuto to follow. In fact, when asked whether Fox News maintains "any written standards or guidelines regarding ethical journalism," Mr. Wallace responded that it did not. Id. at 19. Even assuming Fox News maintained such a standard, however, aside from Mr. Blankenship's bare assertion, he has failed to

demonstrate that Mr. Cavuto's statement would have amounted to an "extreme departure" therefrom.  <u>Harte-Hanks</u>, 491 U.S. at 665 ("a public figure plaintiff must prove more than an extreme departure from professional standards.").  Moreover, the court notes that the full statement made by Mr. Cavuto was: "<u>The president [is] warning Republicans</u>, you know what, we're going to lose West Virginia if Don Blankenship is allowed to win the primary and he does win the primary."  ECF 890-9 at 18 (emphasis added).  When viewed in its entirety, it thus appears Mr. Cavuto was reporting on a statement made by President Trump, not making the suggestion himself.

Furthermore, assuming <u>arguendo</u>, that Mr. Cavuto's statement could demonstrate "partisanship animus" towards Mr. Blankenship, mere political bias alone is insufficient to establish actual malice by clear and convincing evidence.  <u>See</u> <u>Hinerman</u>, 423 S.E.2d at 573.  Indeed, "the motivations behind defendants' communications -- inspired by political differences or otherwise -- do not impact whether defendants acted with actual malice as a matter of law."  <u>Arpaio</u>, 414 F. Supp. 3d at 92 (citing <u>Harte-Hanks</u>, 491 U.S. at 665 ("[A defendant's] motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice.")); <u>see also</u> <u>Palin v. New York Times Co.</u>, 940 F.3d 804, 814 (2d Cir. 2019) (noting "political

opposition" and "sheer political bias" alone do[ ] not constitute actual malice"); <u>Lohrenz v. Donnelley</u>, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), <u>aff'd</u>, 350 F.3d 1272 (D.C. Cir. 2003) (noting "a media defendant's 'adversarial stance' may be 'fully consistent with professional, investigative reporting' and is not 'indicative of actual malice.'").

As to the statements made by Mr. Layfield, Mr. Blakeman, Ms. Hamill, and Ms. MacDonald, Mr. Blankenship has failed to produce a shred of evidence demonstrating they knew their statements to be false or acted in reckless disregard for the truth at the time they were uttered.  Aside from merely reciting the statements spoken by these individuals, Mr. Blankenship's briefing lacks any substantive discussion whatsoever regarding their particular states of mind at the time their challenged statements were made.  Moreover, Mr. Blankenship conceded during his deposition that he lacked any evidence that Mr. Layfield, Mr. Blakeman, Ms. Hamill, or Ms. MacDonald personally knew their references to him as a felon were incorrect at the time they were made.  <u>See</u> ECF 890-2 at 44-52.  The only evidence existing in the record regarding these individuals is that they believed their statements to be correct and had no serious doubts about their beliefs.  <u>See</u> ECF Nos. 890-15; 890-16; 890-17; 890-18.

As to Judge Napolitano, Mr. Blankenship has likewise failed to present clear and convincing evidence that would contradict Judge Napolitano's testimony that he made an "honest mistake" when he stated Mr. Blankenship had been convicted of manslaughter "because he believed it was true at the time."  ECF 890-13 at 4.  Indeed, Mr. Blankenship conceded during his deposition that he had "no evidence that [Judge Napolitano] knew" his statement was false when it was made.  ECF 890-2 at 38.  In fact, Mr. Blankenship further testified that "he thought [Judge Napolitano] was pretty convincing that he made a mistake."  Id. at 39.  To the extent Mr. Blankenship avers Judge Napolitano, or any of the other individual speakers, "turned a deaf ear to [his] explicit remarks about his misdemeanor conviction during the Fox [News] debate," his assertion is meritless as he has presented no evidence that any of these individuals watched the debate or the portion he references.

Mr. Blankenship's remaining alleged evidence of actual malice is equally without merit.  He first points to the fact that several "Fox producers" declined Mr. Napolitano's initial requests for airtime in efforts to immediately "correct the record."  ECF 953 at 18.  Even so, "[a]ctual malice cannot be inferred from a failure to retract . . . a statement once the publisher learns that the statement is false."  Blankenship, 451

96

F. Supp. at 618 (quoting <u>Sullivan</u>, 376 U.S. at 286); <u>see also</u>

<u>Pippen</u>, 734 F.3d at 614 (noting that "[t]he Supreme Court . . .

has said that actual malice cannot be inferred from a

publisher's failure to retract a statement once it learns it to

be false.").

Lastly, it appears Mr. Blankenship alludes to a May 4,

2018, Fox News telecast of <u>The Story with Martha MacCallum</u>, on

which Fox News political contributors Karl Rove and Tammy Bruce

appeared as guests, as evidence of actual malice.  Mr.

Blankenship contends during this show, Ms. MacCallum

"orchestrated a nationally televised character assassination of

[him] . . . less than a day after [Senator] McConnell's staffer

informed MacCallum that [Senator] McConnell was 'pretty ticked'

at Mr. Blankenship."[52]  ECF 953 at 17.  He notes that during the

show, Mr. Rove "callously called [him] a 'bigot,' 'moron,' and

_____

[52] In a May 3 and 4, 2018, email exchange Ms. MacCallum and
a member of Senator McConnell's staff discussed a news report
detailing, among other things, Mr. Blankenship's criticisms of
Senator McConnell and his wife and her family's purported ties
to China.  <u>See</u> ECF 953-15.  During this exchange, Ms. MacCallum
stated "[t]here are so many issues with [Mr. Blankenship], never
enough time to hit them all." <u>Id.</u> at 2.  In response to the
staffer's comment that Senator McConnell was "pretty ticked" at
Mr. Blankenship's criticisms, Ms. MacCallum replied, "I don't
blame [Senator McConnell] at all.  It's all about [Mr.
Blankenship], he thinks he's more of a victim than the miners."
<u>Id.</u>  She also stated that she planned to report one of Mr.
Blankenship's criticisms of Senator McConnell as "4 pinnochios."
ECF 954-16 at 2.

'crook' while Ms. Bruce dubbed [him] an 'embarrassment' and remarked: 'The good news is, Blankenship will be rejected . . ."  Id.[53]  Mr. Blankenship further contends that "[a]lthough there technically may have been no defamatory statements during MacCallum's beatdown of [him], it served as a foundation for the false narrative that Fox would persistently endorse on the eve of the primary election."  Id.  He contends "Ms. MacCallum's coordination with Senator McConnell and Mr. Rove to malign [him] on Ms. MacCallum's show was unquestionably indicative of actual malice."  ECF 1053 at 19.

Neither Ms. MacCallum nor Mr. Rove are alleged in Mr. Blankenship's complaint to have defamed him.  Thus, similar to the Murdoch email addressed above, the court fails to see how Ms. MacCallum and Mr. Rove's conduct relates to what the speakers of the challenged statements knew at the time the alleged defamatory references were made.  Indeed, Mr. Blankenship has provided no evidence demonstrating that Ms.

---

[53] In support of this contention, Mr. Blankenship cites to a link to a video, which, though currently available on a website, is not available in the evidentiary record.  See ECF 953 at 17 n.34.  The day after the broadcast, Senator McConnell emailed Mr. Rove and thanked him for his comments on the program.  See ECF 953-18 at 8.  Mr. Rove replied, "Happy to help.  W[ha]t a sick, twisted moron."  Id. at 9-10.

MaCCallum or Mr. Rove somehow impacted or influenced the speakers of the challenged statements in any way.

To the extent Mr. Blankenship avers the email communications between Ms. MacCallum and Senator McConnell's staff member and Mr. Rove and Senator McConnell before and after the program demonstrate a concerted effort to defame Mr. Blankenship, the court is unconvinced.  The email communications at no point even mention Mr. Blankenship's conviction. Furthermore, neither Ms. MacCallum nor Mr. Rove mischaracterized Mr. Blankenship's conviction at any point during the broadcast. The discussion of Mr. Blankenship during the program amounts to nothing more than harsh criticism of a candidate for political office and "it can hardly be doubted that the constitutional guarantee [provided by the First Amendment] has its fullest and most urgent application precisely to the conduct of campaigns for political office." Monitor Patriot Co. v. Roy, 401 U.S. 265, 272 (1971).  While Mr. Blankenship may have found the discussion on Ms. MacCallum's program offensive, pronounced criticism and disapproval by others is a natural consequence of stepping into the modern-day political arena.  And it certainly fails to establish that the actual speakers of the alleged defamatory statements at issue acted with actual malice. Ultimately, the evidence upon which Mr. Blankenship relies "is

of insufficient caliber or quantity to allow a rational finder
of fact to find actual malice by clear and convincing evidence."
Anderson, 477 U.S. at 254.  Accordingly, Fox News is entitled to
summary judgment.

### 7.  Summary

In sum, the court has concluded that Mr. Blankenship
has failed to present clear and convincing evidence of actual
malice as to each of the moving defendants.  Accordingly, they
are entitled to summary judgment on Mr. Blankenship's defamation
claims against them on this ground.[54]  The court notes that its
ultimate conclusion on this point should not be taken as an
endorsement of the moving defendants' errors.  As explained in
Apraio, "[t]he media is entrusted with the important
responsibility of reporting on issues of great public importance
so that the American people can make informed decisions at the
ballot box and elsewhere" and even honest mistakes are capable
of harming public figures and "diminish[ing] voters' abilities
to impartially weigh the issues that affect them."  414 F. Supp.
3d at 93.  Nonetheless, "erroneous statements are inevitable in

---

[54] Inasmuch as Mr. Blankenship has failed to produce clear
and convincing evidence of actual malice, an essential element
of his defamation claims, the court need not address the
sufficiency of evidence with respect to the remaining elements.

free debate" and, in the absence of evidence of actual malice, "must be protected if the freedoms of expression are to have the breathing space that they need to survive." <u>Sullivan</u>, 376 U.S. at 271-72.

## IV.  False Light Invasion of Privacy

West Virginia recognizes a legally protected interest in privacy.  <u>Tabata v. Charleston Area Med. Ctr., Inc.</u>, 759 S.E.2d 459, 464 (W. Va. 2014).  "Publicity which unreasonably places another in a false light before the public is an actionable invasion of privacy."  Syl. Pt. 12, <u>Crump</u>, 320 S.E.2d at 74.  While the Supreme Court of Appeals of West Virginia has not definitively set forth elements for this claim, it appears a plaintiff who qualifies as a candidate for public office must prove that: (1) the defendant gave publicity to a matter concerning the plaintiff that places the plaintiff before the public in a false light, (2) the publicity was widespread, (3) the matter of the publicity was false, (4) the false light in which the plaintiff was placed would be "highly offensive to a reasonable person," and (5) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed" (i.e., actual malice).  <u>Taylor v. W. Virginia Dep't of</u>

Health & Human Res., 788 S.E.2d 295, 315–16 (W. Va. 2016)
(citing Restatement (Second) of Torts § 652E (1977)); see Crump,
320 S.E.2d at 87-88.

Although "false light invasion of privacy is a
distinct theory of recovery entitled to separate consideration
and analysis," such claims are similar to defamation claims and
courts often treat them in essentially the same manner.  Crump,
320 S.E.2d at 87.  As the Supreme Court of Appeals of West
Virginia has recognized, the First Amendment-derived actual
malice standard announced in Sullivan applies to claims for
false light invasion of privacy brought by plaintiffs who are
public officials or public figures.  See Crump, 320 S.E.2d at
88-89 (citing Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967);
Time, Inc. v. Hill, 385 U.S. 374 (1967)).

Thus, to withstand summary judgment on his false light
invasion of privacy claim, Mr. Blankenship, as a matter of
federal constitutional law, must adduce sufficient evidence that
could reasonably support a jury finding of actual malice by
clear and convincing evidence.  See Anderson, 477 U.S. at 255-
56; see also Howard v. Antilla, 294 F.3d 244, 248-49, 252 (1st
Cir. 2002) (requiring actual malice to be proved by clear and
convincing evidence for false light invasion of privacy claim);
Solano v. Playgirl, Inc., 292 F.3d 1078, 1084 (9th Cir. 2002)

(same); Ashby v. Hustler Mag., Inc., 802 F.2d 856, 860 (6th Cir. 1986) (same); Douglass v. Hustler Mag., Inc., 769 F.2d 1128, 1140 (7th Cir. 1985) (same); cf. Parson v. Farley, 800 F. App'x 617, 623 (10th Cir. 2020) (affirming jury instructions requiring actual malice to be proved by clear and convincing evidence for false light invasion of privacy claim); Peoples Bank & Tr. Co. of Mountain Home v. Globe Int'l Publ'g, Inc., 978 F.2d 1065, 1067 & n.2 (8th Cir. 1992) (same).

As explained in detail above, Mr. Blankenship has failed to produce clear and convincing evidence that could reasonably support a jury finding that the moving defendants acted with actual malice.  Accordingly, the moving defendants are likewise entitled to summary judgment on Mr. Blankenship's claims against them for false light invasion of privacy.

## V.   Civil Conspiracy Claims

In addition to his defamation and false light invasion of privacy claims, Mr. Blankenship's complaint contains sufficient factual allegations alleging that Fox News participated in a "shared . . . common plan for the commission of the tort[s] of defamation" and "false light invasion of privacy."  ECF 14 ¶¶ 233, 246.

West Virginia recognizes the tort of civil conspiracy as a cause of action.  *Jane Doe-1 v. Corp. of President of The Church of Jesus Christ Latter-day Saints*, 801 S.E.2d 443, 458 (2017).  "A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means."  Syl. Pt. 8, *Dunn v. Rockwell*, 689 S.E.2d 255, 259 (2009).  A claim for civil conspiracy is not created by the conspiracy itself "but by the wrongful acts done by the defendants to the injury of the plaintiff."  *Id.*  A civil conspiracy therefore "is not a *per se*, stand-alone cause of action." Syl Pt. 9, *Dunn*, 689 S.E.2d at 259.  Instead, it is "a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."  *Id.*  Simply put, "[a] conspiracy is not, itself, a tort.  It is the tort, and each tort, not the conspiracy, that is actionable."  *Id.* at 269 (quoting *Segall v. Hurwitz*, 114 Wis.2d 471, 481, 339 N.W.2d 333, 338 (Wis.App.1983)).

Inasmuch as Mr. Blankenship's defamation and false light invasion of privacy claims against Fox News fail, so too does his civil conspiracy claims premised on these underlying

torts.  Indeed, in the absence of a viable claim for defamation or false light invasion of privacy, Mr. Blankenship's alleged conspiracy claims against Fox News to commit the same fail as a matter of law.  See Long v. M & M Transp., LLC, 44 F. Supp. 3d 636, 652 (N.D.W. Va. 2014) (concluding because there was "no underlying tort to support the [plaintiff's] civil conspiracy claim" it failed as a matter of law); see also Wittenberg v. Wells Fargo Bank, N.A., 852 F. Supp. 2d 731, 754 (N.D.W. Va. 2012) (concluding inasmuch as "no viable tort claim remains in this action . . . , any claim of civil conspiracy fails as a matter of law.").

## VI.  Conclusion

Based upon the foregoing discussion it is ORDERED that the following motions for summary judgment are GRANTED: News & Guts, LLC (ECF 880); MSNBC Cable, LLC (ECF 882); Cable News Network, Inc. (ECF 884); WP Company LLC (ECF 886); American Broadcasting Companies, Inc. (ECF 888); Fox News Network, LLC (ECF 890); Eli Lehrer (ECF 898); Mediaite, LLC and Tamar Auber (ECF 900); Griffin Connolly and FiscalNote, Inc. (ECF 903), and H.D. Media, LLC (ECF 945).  It is further ORDERED that these defendants are DISMISSED from this action.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: February 2, 2022

John T. Copenhaver, Jr.
Senior United States District Judge